Collagan v. Burns.

———◆———

SARAH A. B. COLLAGAN, executrix, appellant, *vs.* HARRISON B. BURNS and others.

A will, made in 1854, and presented for probate soon after the death of the testator in November, 1863, had been torn into fragments and pasted together upon another sheet of paper. On the trial of the issue involving a revocation by tearing, *Held*, by APPLETON, C. J., KENT, BARROWS, and TAPLEY, JJ., (1) That declarations of the testator, during his last sickness, made when having the will in his possession, and while pasting the torn parts together, or while reading the same after the torn parts were so pasted together by him, that the will had been torn by his mother; and (2) That declarations of good will and affection for his wife, the principal legatee, are admissible for the purpose of negativing the fact of its intentional cancellation by him.

By CUTTING, WALTON, DICKERSON, and DANFORTH, JJ., that such declarations are not admissible on the trial of such an issue.

When an illegal answer to a legal question in a deposition is read, and the presiding judge immediately, in the presence and hearing of the jury, announces that the answer is inadmissible, but that as it has been read he cannot exclude it, but that he shall instruct the jury to disregard it; a new trial will not be given on the ground that no further instruction was given, unless the attention of the presiding judge was specially called thereto.

By Public Laws of 1870, c. 100, § 1, in any civil action in which there is a subsisting verdict of a jury, if a majority of the justices qualified to sit in the case, do not concur in granting a new trial, it shall be the duty of the court to order judgment on the verdict.

APPEAL from a decree of the judge of probate for this county, disallowing what was propounded as the last will and testament of the late William Collagan, formerly the husband of the plaintiff, on the ground that he in his lifetime revoked it, by tearing it in pieces.

The will was dated February, 1854.

The case came up for trial at the April term, 1867. The alleged will had been destroyed, together with all the probate records of the county, in the great conflagration of July 4, 1866.

The appellant introduced a copy of the alleged will; and it was proved that when the will was presented for probate, it had been torn in pieces and pasted upon another sheet of paper; that the names of the witnesses, the name of the testator, and the seal, had each been torn off separately; and that the will was otherwise torn. The witnesses did not agree as to the number of pieces, but the defendants claimed that the tearing bore *prima facie* marks of design, raising the presumption that it was torn by the testator, *animo revocandi*. This was not questioned by the plaintiff; but testimony was introduced by her to explain and account for the tearing, and rebut the presumption that it was torn by the testator.

Much testimony in behalf of the plaintiff was admitted against the objection of the defendants, of the following kinds, a part of each being as follows: 1. Declarations of the testator made during his last sickness, relating to his will, but objected to on the ground that they did not explain nor accompany any act material to the issue.

Thus, *Hannah Harding* testified, *inter alia*, that a short time before testator died, she saw him have the will in controversy; that he read it, reading the names of the witnesses aloud; that plaintiff was present; that the testator told his wife the will was good; that it was right; that she would have no trouble in proving it; and that Mr. Deblois would tell her where the witnesses were.

*Martha E. Holmes* testified, that she went to testator's room in July or August, 1863; that he was on his couch with a board before him, on which was the will in controversy; that she read it as it lay there; that it was moist; that it had been pasted, but that the testator did nothing to it while she was there; that he said, " Mother has been making a fuss, and has torn my will." Witness asked him if it would not have been better to make a new one, and he replied, " it would not, some would say he was sick, and not fit to make a new will."

*Joseph Harding* testified, that he was present at the same time with Mrs. Holmes; that testator had a paper before him on a board, working on it, which testator said was his will made in Boston; that the testator finished pasting it in witness' presence; and that testator then said, " the old woman had got in one of her tantrums, and had torn it, but that he could fix it together again."

*Harriet H. Leonard* testified, that she was in testator's room some time in August, 1863; that he took the will in controversy from his portfolio; that he said it was his will made in Boston; " that his mother had torn it in one of her tantrums;" but that he " had repaired it so that it was just as good as ever."

*Rachel Pierce's* deposition contained similar testimony.

2. Declarations of the testator, made during his last sickness, relating to his property, but objected to on the ground that they did not relate to his will, nor explain or accompany any act material to the issue.

Thus, *Harriet H. Leonard* testified, that she saw the testator a few weeks before he died; that he then said he " had given Sarah (plaintiff) all his property, and she would pay witness' father, and all honest debts."

*Mary Gordon* testified, that she called on the testator about three weeks before he died; that he said nothing about any will; that he said, " all he possessed was Sarah's," and he " wished it was more."

3. Declarations of the testator concerning the plaintiff, not relating to the will, or the property, objected to as not only irrelevant, but as tending to prejudice the minds of the jury.

Thus, *Mary Gordon* testified, that during the same conversation before named, the testator said the plaintiff " had been untiring in her devotions night and day, and that there was nothing that she could do for him that she had not done."

*Harriet Gordon* testified, that she called on the testator a few weeks before he died; that he said nothing about the will; that he said that all he possessed was Sarah's; and that she had been a faithful wife, untiring in her attentions.

*Joanna Farrington* testified, that she was with the testator about three weeks before he died; that after speaking of his will, saying that he had willed everything to Sarah, he said she had done everything for him, night and day; and he did not know as he appreciated her so much as he ought to.

4. *Mary J. Bailey*, a witness called by the defendants, testified, that in June, 1863, she saw the plaintiff paste together a paper, which the witness afterward identified as the will in controversy.

She had testified to the same fact at the trial of this case at the October term, 1866. At that trial, Moses Kimball was called by the plaintiff, and testified, that Mrs. Bailey (witness) had previously said to him that she did not think plaintiff pasted the will; that she did not think plaintiff had brains enough to do it; but that she thought the testator might have done it.

Kimball was not present at the present trial, but his deposition, taken by the plaintiff, was read to the jury. It contained the following question and answer, to both of which objections were made and noted when the deposition was taken: "When and where did you next have an interview with Mrs. Bailey, and what was said, state fully?" "When I was coming out of the court-house at Portland, after testifying in this case, in November last, she commenced and used very abusive and profane and obscene language. I passed her in silence."

When the plaintiff's attorney, in reading the deposition to the jury, came to the foregoing question and answer, the defendants' counsel renewed the objection, saying, "that is objected to."

The question was read, and the presiding judge overruled the objection, and allowed it to be read to the jury, and the attorney then read the answer also to the jury. After it was read, the presiding judge said to the counsel, that the answer was inadmissible, but as it had been read to the jury, he could not exclude it; that he could do no more than to instruct the jury to disregard it; and that, he thought, his duty to both parties required him to do.

But no such instructions were given, otherwise than in the remark to counsel, as above stated, at the time of the reading; and the deposition was given to the jury as it was read.

The verdict was for the plaintiff, and the defendants alleged exceptions.

*Woodbury Davis* and *H. P. Deane*, in support of the exceptions, cited Redfield on Wills, 539, § 1, 544, § b, 543, § b; *Comstock* v. *Hadlyme*, 8 Conn. 254; *Robinson* v. *Hutchinson*, 26 Verm. 83; *Kinne* v. *Kinne*, 9 Conn. 102; *McTaggart* v. *Thompson*, 14 Penn. 159; *Waterman* v. *Whitney*, 1 Kernan, 157; *Bartlett* v. *Nottingham*, 8 N. H. 300; *Wadsworth* v.*Ruggles*, 6 Pick. 63; *Hodges* v. *Strong*, 10 Verm. 247; *Farrar* v. *Ayers*, 5 Pick. 404; *Barrett* v. *Wright*, 13 Pick. 45; Greenl. on Ev. 290; *Brown* v. *Saltonstall*, 3 Met. 423; *Weston* v. *Foster*, 7 Met. 297; Redfield on Wills, 569, note 66; 1 Jarman on Wills (Perkins' 2d ed.), 77; *Stevens* v. *Vanclerc*, 4 Wash. C. C. 265; *Jackson* v. *Kniffen*, 2 Johns. 31.

*J. S. Abbott, J. F. Pickering*, and *N. Webb*, for the plaintiff, cited *Betts* v. *Jackson*, 6 Wend. 187; *Davis* v. *Davis*, 2 Addams, 225; 2 Am. Lead. Cas. 655 *et seq.*; *Macbeth* v. *Macbeth*, 11 Ala. 596; *Brady* v. *Cubit*, 1 Doug. 30, 39; *Flentham* v. *Bradford*, 10 Barr. 82; *Yerby* v. *Yerby*, 3 Call, 334; *Sumner* v. *Bayne*, 7 Vesey, jr., 508; *Johnson* v. *Johnson*, 1 Phill. 460; *Colvin* v. *Fraser*, 2 Hag. 361; *Emerson* v. *Barille*, 1 Phill. 343; *Fox* v. *Marston*, 1 Curtis, 496, 1 Jarman on Wills, 119.

APPLETON, C. J. This is an appeal from a decree of the judge of probate, disallowing what was propounded as the last will and testament of William Collagan, the appellant's husband, on the ground that he in his lifetime revoked the same, by tearing it in pieces.

The will, when produced for probate, had been torn in pieces and pasted upon another sheet of paper; the names of the testator and of the witnesses had been torn off separately, as well as the seals; and the will was otherwise torn. The appellees claimed that the tearing bore *prima facie* marks of design, raising the presumption, that it was torn by the testator *animo revocandi*. This legal presumption was not questioned by the appellant; and testimony was

introduced by her to explain and account for the tearing, and rebut the presumption that it was torn by the testator.

That the will produced was once a legal instrument was not denied, nor that it had been torn by some one. By whom torn, and with what intent torn, were the issues presented to the jury.

A will is ambulatory during the life of the testator. It is his present act, when made ; but it cannot take effect till after his decease. Until that time it is under his control, to be changed, modified, or revoked, according to his good pleasure. It derives its prospective efficiency from his present intention. Its continuing and final validity depends on such continuing intention. That intention the law regards as continuing unless a change of purpose is shown in the manner required by the statute. The intention is the element which gives vitality ; and that is only ascertainable by and from the acts and declarations of the testator.

As the continuing validity of the will depends on the intention of the testator that the instrument purporting to be his last will and testament shall be and continue to be such, it would seem to follow that his declarations, equally with his acts, would be receivable to prove or disprove an intention existing at a given time ; or the intention with which a particular act was done. The declarations of a grantor or assignor are admissible against his grantee or assignee, if made when the title to the estate granted or assigned is in him. So the declarations of a testator as to his acts and intentions in reference to an instrument under his control, would seem to be equally competent testimony. Accordingly, by the common law, the revocation of a will could be shown by the verbal or written declarations of the testator, or by acts proving a design to deprive the will of validity, or to disaffirm its existence as a subsisting and operating instrument. 2 Am. Leading Cases, 643. *Card* v. *Grinman*, 5 Conn. 164. Evidence of this description should be received, except so far as it is made inadmissible by statutory enactments.

A will, executed in accordance with the provisions of R. S., 1857, c. 74, " is valid, until destroyed, altered, or revoked by being

intentionally burnt, canceled, torn, or obliterated by the maker, or by some person by his direction and in his presence, or by a subsequent will," &c., § 3.

The will produced, from whose custody was it obtained? From that of a depositary, or of the testator? In the latter case, a presumption of intentional cancellation by the testator arises from its torn and fragmentary condition. When a will is left in the charge of the testator, and is not found, or is found torn or obliterated, the presumption is, that the tearing or obliteration was with the intent to cancel. These acts, if done by the testator, imply an intent to revoke what before it was his intent to establish. If the will is traced out of the possession and custody of the deceased, it rests with the other party, either to show that it came again into his possession, or that it was destroyed by his direction, or with his privity and consent. *Colvin* v. *Fraser*, 2 Hag. 266 (4 Eng. Eccl. 113).

The will was torn in pieces. By whom and why was it so torn? The will was the testator's act when made and perfected. His intention, then, was conclusively established. The tearing may have been by the testator, or by some one else without his knowledge. If torn by a stranger, it is, notwithstanding this, his will. So it is equally the testator's will though he may have torn or destroyed it, if done by accident or mistake, without the intent to cancel. "Now it is perfectly true," observes Sir John Nichol, in *Thynne* v. *Stanhope*, 1 Addams, 52 (2 Eng. Eccl. Rep. 23), "that, in legal consideration, a will may be canceled without being revoked. The canceling itself is an equivocal act, and, in order to operate as a revocation, must be done *animo revocandi*. A will, therefore, canceled through accident or by mistake (as in the instances put by Lord Mansfield, in the case of *Burtenshaw* v. *Gilbert*, Cowp. 52, and similar ones), is not revoked. . . . I assent, therefore, to the general legal position, that the cancellation of a will does not, necessarily, infer any intentional abandonment of the dispositions contained in, or, consequently, any revocation of it. At the same time, it is obvious that this is the ordinary inference, deducible from every act of canceling. And I may venture to lay down, that in

order to bar its application to any particular case of canceling, two things at least are requisite : first, it must be proved by indisputable evidence, that the canceled paper once existed as a finished will ; secondly, it must be shown, by evidence equally indisputable, that the testator adhered to it throughout, in mind and intention, notwithstanding its cancellation. In the absence of either of these indispensable requisites, the ordinary presumption is that upon which a court of probate is bound to act."

The will was before the court. The fragments into which it had been torn were carefully collected and pasted upon a sheet of paper, so that the will, in its completeness, was preserved. While the tearing, if done by the testator, would indicate an intent to destroy, the careful collection of all the parts by him would show an intention to preserve ; and his preservation of them would indicate, that in his mind the instrument was his will, and would negative, in some measure, the inference otherwise arising, that the will was torn by him and with the intent to revoke.

*In the goods of Colburg*, 2 Curteis, 832 (7 Eng. Eccl. 327), the testator, in a moment of irritation, tore the will into four pieces, but afterwards repenting of what he had done, desired his housekeeper to stitch the will together again, saying he did not mean to destroy the will. At the hearing, the next of kin were absent. " The deceased," remarks Sir Herbert Jenner, " having torn the will into four pieces, it must be presumed, *prima facie*, that he intended to revoke it; if the questions were propounded in an allegation, and witnesses examined in support of it, I should probably be of opinion that it was not revoked, as in *Doe* v. *Perkes*, 3 B. & A. 489. But the court cannot, upon an *ex-parte* motion, decree probate in the absence of the next of kin. Upon a proxy of consent from the next of kin, probate may pass." In *Doe* v. *Perkes*, 3 B. & A. 489, the testator, in a fit of passion against one of the devisees, tore his will into four pieces, but upon a remonstrance of a bystander, he desisted from further tearing it ; and, after having fitted the pieces together, and finding no material words obliterated, remarked, " It is well it is no worse." The will was found, after his death, in four parts.

It was submitted to the jury to determine whether the act of cancellation was complete, and they found a verdict establishing the will, which the court, upon a motion for a new trial, sustained. In the case to which reference was last had, the fragments of the will were neither pasted nor stitched together; acts tending to disprove an intent to cancel. *In the goods of David Doane*, Spinks, 106, the testator, having duly executed his will, became afterwards of unsound mind, and, while in that state, destroyed it. Having partially recovered, he expressed regret and gave directions for the preparation of another to the same effect. Before this was done, he committed suicide. Probate was granted of the unexecuted draft of the will." There was no *animus revocandi*, says Sir John Dodson. In *Clarke* v. *Scripps*, 22 Eng. L. & Eq. 627, one W. A. S. left a will; from the bottom of the several pages of this will the name of the testator had been torn or cut; part of one page had also been torn off, but was reannexed by a pin. The signature of the testator of the subscribing witnesses at the end of the will remained. *Held*, that the will was not revoked, partially or entirely. "It is not the mere manual operation of tearing or cutting the instrument, or the act of throwing it in the fire, or of destroying it by other means," remarks Sir John Dodson, "that will satisfy the requisites of the law, but the act must be accompanied with the intention of revoking. There must be the *animus* as well as the act; both must concur to constitute a valid legal revocation." To show the *animus* with which the act is done, recourse would seem naturally to be had to the declarations of the testator, as well as to the surrounding and attendant circumstances.

But the presumption, when the will, left in the custody of the testator, is found torn, that the tearing was by him and with the intent to cancel the same, may be rebutted.

To rebut this presumption, the appellant offered in evidence the acts of the testator,—as collecting, drying, and pasting together the parts of the torn will,—and his declarations while so collecting and drying the same, and after it was dried, and when reading the same, all being parts of one and the same transaction, to the

effect that the will was torn by his mother-in-law "in one of her tantrums;" that it was his will; thus negativing its destruction by himself and all intent of cancellation on his part.

These acts were done and these declarations made during the testator's last sickness, and were received subject to objection. Their importance as evidentiary of his intention, cannot be doubted. Their truth, the jury have affirmed. They tend to negative the presumption of law. They explain the fragmentary condition of the will. They disprove alike the fact of canceling and the intention to cancel on the part of the testator.) They best, if truly reported, indicate his mind and purpose. Unless received, being true, an act of spoliation becomes triumphant, and the deliberate will of the testator, in relation to the final disposition of his estate, is defeated. Seeking to ascertain his intention, shall the most obvious and natural mode of ascertaining such intention be disregarded? What act more significant of preservation than that of pasting carefully together the torn fragments of a will? What more decidedly negativing all purpose of its destruction? What more cogent and convincing evidence of intention than the deliberate statements of the testator, when on the bed of sickness and in the very presence of death? True, the force of this latter species of testimony may be weakened by the infirmative considerations with which it is ever attended. The declarations of the testator may have been false, and uttered to deceive; or, being true, they may have been misunderstood, in whole or in part, from inattention; they may have been misrecollected from forgetfulness, or misreported from design. But all this affects the degree of credit to be given the testimony, not its admissibility. It shows that caution should be used in weighing it, not that it should be excluded. The exclusion of evidence relevant and material, from the fear that it may not receive its just degree of credence, is the rude resort of barbarism. Civilization hears, weighs, examines, compares, and then decides:

Proof of the acts of the testator, as gathering and pasting together the torn parts of his will, were unquestionably admissible. They were equally so as would be the act of mutilating or tearing the

same. Whether the act be one indicating destruction or preservation, it is equally for the consideration of the jury.

But when the act is one material and relevant, and proper for the consideration of the jury, the declarations of the actor accompanying and explanatory of the acts done, are uniformly admissible as part of the *res gestœ.* If the tearing was by mistake, as if the testator should commence the destruction of his will under the impression that it was another and different instrument, and should so say, while in the act of destruction, his declarations as a part of the *res gestœ* would clearly be admissible. So if the tearing is for the purpose of destroying his will, his declarations indicating his purpose, are properly received to give the true character to the act done. Equally so must be his declarations made, when attempting to preserve the parts of a will, by whomsoever torn, for the purpose of showing the object of his then action. In *Stuart* v. *Hanson*, 35 Maine, 507, Wells, J., says, " It may be difficult to determine, at all times, when declarations shall be received as part of the *res gestœ.* But when they explain and illustrate it, they are clearly admissible. Mere narrations of past events, having no necessary connection with the act done, would not tend to explain it. But the declaration may properly refer to a past event as the true reason of the present conduct." The declarations of the testator, while in the act of pasting together the torn fragments of his will, stating the reasons and purpose of his action, and evidencing his then intention, and so far negativing the inference apparently arising from the condition of the will, are properly received as part of the *res gestœ.*

In courts of common law as in those having jurisdiction of the probate of wills, declarations of the testator have been received to strengthen or repel the presumption, that a will once legally executed, but not found at the death of the testator, had been destroyed by him. In *McBeth* v. *McBeth*, 11 Ala. 596, in case of an alleged lost will, the declarations of the testator were admitted, that he had made one. In *Smock* v. *Smock*, 3 Stockton, 157, the declarations of the testator were received to rebut the presumption, that the mutilation of the will was by his act. Revocation is a question of

intention, and the acts and declarations of the maker of the will are admissible for the purpose of ascertaining whether it was revoked. *Smiley* v. *Gambill*, 2 Head, 164. It was decided in *Youndt* v. *Youndt*, 3 Grant (Penn.), 140, in an issue to try the validity of a will alleged to be revoked by a subsequent will which had been destroyed, that the declarations of the testator, up to near the time of his death, concerning it, were competent evidence to show that the destruction was not by his direction. "It became necessary," observes Lowrie, J., "to show that the testator himself did not destroy the will (of 1859), and for this purpose his conduct and declarations concerning it, up near to the day of his death, were very direct evidence in establishing the negative."

In *Sawyer* v. *Smith*, 8 Michigan, 412, after the death of the testatrix, a will twenty-five years old was discovered in a barrel among other waste papers, and either torn or worn into several pieces, which were scattered loose among the papers in the barrel. Whether the injury to the instrument was done by the testatrix or by some other person ; and if by her, whether accidentally or intentionally, and for the purpose of revoking the will, were questions of fact for the jury; and to aid them in determining these questions, and not as separate and independent evidence of a revocation, the declarations of the testatrix, made after the date of the will, that she had destroyed it, were held competent evidence. In *Whitely* v. *King*, 10 Jurist, N. S. 1079, the facts were these : A will, after its execution, was retained by the testator in his own custody, but after his death it could not be found. To rebut the presumption of law, that it had been destroyed, evidence was offered of certain declarations made by the deceased, up to within a few days of his death. It was objected, that these declarations, unaccompanied by any act, were not evidence. But the evidence was held admissible. "It being a presumption of fact," observes Erle, C. J., "that, as the will cannot be found, it has been destroyed by the testator, evidence is admissible to rebut the presumption. When any evidence of revocation has been given, evidence of a contrary character is always admitted; and declarations by the testator are among the

most cogent means of discovering his intention. They form the most safe guide to the judge in deciding whether the testator intended to revoke or not." In *Bulkely* v. *Redmond*, 2 Bradford's Surrogate Rep. 284, referring to the declarations of the testator, that he had destroyed the will, the court says: "Such declarations would, of course, have no weight in the face of the instrument if produced uninjured. A revocation cannot be proved by parol, in opposition to a valid will known to exist. Such declarations can only be competent in connection with proof of an act of cancellation, or to repel or strengthen a presumption of cancellation. It may be material to show, *quo animo*, an act is done, or to elucidate facts and circumstances bearing upon the question of cancellation." If the fact of the tearing of a will is brought home to the testator, and he fails to publish another, it is held *prima facie* evidence of his intention to revoke the will destroyed; but this presumption may be rebutted by proof "of the acts and declarations of the testator himself, as being the natural and appropriate indications of his inward thoughts and intention." *Steele* v. *Price*, 5 B. Mon. 58.

There is another class of declarations to the admission of which exceptions are taken, such as, that the testator, in his last sickness, said that he had given the appellant all his property, that all he possessed was hers, that she had been untiring in her devotions day and night, that there was nothing she could do for him that she had not done, and that he had willed everything to her, &c.

That there was originally a valid will was not denied. The questions to be determined were, whether the testator had destroyed his will, and if so, whether the destruction was intentional or not.

The intentions of a party may be inferred from his acts, or may be known from his declarations. The declarations introduced show the amicable relations between the testator and his wife. They assume the existence of a valid subsisting will. They negative by necessary implication its intentional destruction. They were made when there was no apparent motive for concealment or deception. They indicate a firm belief on his part that his will

was in full force, and was to control the disposition of his estate. Had it been shown by similar testimony that there was strife between the parties, that there was neglect or unkindness on the part of the wife, and ill feeling or hate on that of the husband, would not proof of these facts strengthen the presumption of intentional cancellation, arising from the torn condition of the will, as the proof of the opposite facts tends to disprove such presumption?

The condition of the testator, his relation to the objects of his bounty in case the will is established, his relations to those to whom it would descend in case it fails to be established, their condition, their conduct to him and his to them, his past acts and declarations in relation to his estate and its disposition, the state of his affections, when proved may raise an improbability almost amounting to an impossibility, that the testator himself intentionally destroyed his will; they may rebut the *prima facie* presumption arising from the will not being found, or being torn when found; they may show that up to the time of his death he believed his will was existing and would act upon his property, and consequently that its non-appearance, or its torn appearance, was the result of some cause other than the wish or intentional act of the deceased. Evidence of this character is uniformly received in the ecclesiastical courts, and is rarely excluded in the courts of common law. *Lillie* v. *Lillie*, 3 Hag. 184, n. In *Laxley* v. *Jackson*, 3 Phill. 128, the testatrix made a will by which she gave the bulk of her property to a nephew. Finding afterwards that he was living in adultery with a servant-girl, she secretly made a new will, giving the most of her property to others. At her death the last will was not found; and the nephew was permitted to give evidence of the declarations of the testatrix, that after the making of the last will, she had ascertained that he had discarded the servant, and abandoned his dissolute habits, to strengthen the presumption that the testatrix had destroyed the last will for the purpose of reviving the first. Declarations of the testator of a similar character were received in *Richards* v. *Mumford*, 2 Phillimore, 23. These and other cases are cited with approbation by Mr. Chancellor Walworth, in *Betts* v. *Jackson*,

6 Wend. 173. In ~~Paulton~~ v. P*a*ulton, 4 Jur. N. S. 341, the declarations of the deceased, and the probability of her adherence to a will were held to rebut the presumptions of its revocation, from its not being forthcoming. " This presumption is one," observes Creswell, J., " that prevails only in the absence of circumstances to rebut it, and it is therefore called a *prima facie* presumption. It may be falsified, and may be rebutted by many circumstances. Those most commonly relied on are declarations, either of good will to the parties benefited by the will, and of adherence to the will as made, or, on the contrary, of dissatisfaction and change of mind respecting them." The presumption that a will, not forthcoming at the testator's death, was destroyed *animo revocandi*, may be rebutted by proof of declarations of unchanged affections. *Paulton* v. *Paulton*, 1 Swabey & Tristram, 55. If admissible to negative the presumption arising from the will's not being forthcoming, no reason can be perceived why they are not equally admissible to negative the presumption arising from the torn condition of a will when produced.

In *Noel* v. *Patten*, 40 Penn. 484, the testimony, to the admission of which exceptions were taken, was of the declarations of the testator running back to a period of thirty years, and up to within a much later period, that he intended " to leave his farm in the name of Noel," and similar expressions at different times and intervals. " We are of opinion," remarks Thompson, J., " that it was clearly competent, certainly on the point of undue influence. It would strongly rebut the idea of any such influence on the mind of the testator when making his will, if it were shown he made it in accordance with a long-cherished purpose, and especially when, in the execution of that purpose, he was keeping it not only in the name, but amongst his blood relations. This was the purpose of the evidence, and it is sustainable on express and clear authority. *Sterrill* v. *Douglass*, 2 Yates, 46." Equally would the declarations of the testator rebut the idea that he destroyed a will deliberately made, and in accordance with his expressed intentions. The case of *Whitely* v. *King*, 112 E. C. L. 756, has been already referred to, where

the declarations of the testator expressive of his satisfaction at having settled his affairs, and intimating that his will was left with an attorney, were received to rebut the presumption arising from the will not being found, that it had been destroyed by the testator, *animo cancellandi.*  " Surely," says Earle, C. J., " you may look at a man's words to see what his intentions are.   The question here was, whether the testator had the intention to destroy his will and codicil.   Down to the last moment of his life, he is found expressing his satisfaction that he has settled his affairs."   Byles, J., says, " I see no reason why the declarations of the testator should not be admitted as part of his conduct, to show his intentions as to the disposition of his property."   Now it is difficult to perceive any difference in principle in receiving the declarations of a testator to rebut an inference arising from the inability to find a will, or from the condition of the will when found.

So in *Tynan* v. *Paschall*, 27 Texas, 268, it was held, that the declarations of a supposed testator are admissible in evidence to rebut the presumption of a cancellation or revocation of a will, which arises from its destruction or loss previous to his death.   In *Eskersby* v. *Platt*, Law Rep., 1 P. & D. 281, it was decided that the presumption that a will, which cannot be found, was destroyed by the testator with the intention of revoking it, and not with the intention of setting up an earlier will, can be rebutted only by clear and satisfactory evidence.   In *Finch* v. *Finch*, Law Rep. 1 P. & D. 371, a will which had been in the testator's custody could not be found among his papers after his death.   He had recognized its existence up to three weeks of his death, and no change of intention was shown during that period.   The only person interested in an intestacy had searched the testator's papers, and did not appear before the court.   The court refused to presume that the will had been revoked, and granted probate of the draft.

In Dennison's Appeal, 29 Conn. 402, the appellants offered evidence that the testator had declared " that none of his property should go to Ledyard Park's family."   This evidence was rejected, and a new trial was had in consequence of such rejection.   " Dec-

larations and acts of kindness and affection toward a legatee are usual and common circumstances often relied upon in case of a will," remarks Hinman, C. J. "They go to show that a legacy, otherwise inexplicable upon the ordinary motives of human conduct, is a natural and probable act, and therefore a reasonable and free one. Of course it would seem to follow, that contrary declarations and acts must have a contrary effect."

In *Doe* v. *Shallcross*, 16 Ad. & Ell. N. S. 758, Lord Campbell says, "Not only where the competency of the testator is in dispute, but in all cases where there is any imputation of fraud in the making the will, the declarations of the testator are admitted respecting his dislike or affection for his relations, or those who appear in the will to be the objects of his bounty, and respecting his intentions either to benefit them or pass them by, in the disposition of his property."

Now whether it be the making of a will or the destroying of one, the evidence in each case is alike, and for the same reasons admissible.

In the case at bar, one issue was fraud on the part of the appellants in setting up a will alleged to have been cancelled by the testator.

It may not be amiss to examine briefly the cases relied upon as adverse to the admission of the declarations of the testator for the purposes and under the circumstances which have just been the subject of consideration.

The argument against admission amounts to this: that the evidence may be false; that it may be easily fabricated; that if fabricated, the detection of such fabrication will be difficult; that being thus deceptitious, it will lead to misdecision and consequent injustice.

The reasons urged are valid for the exercise of caution in weighing evidence of this character; but there is a material difference between caution and exclusion. They are substantially the same as those formerly urged against the admission of most important testimony heretofore excluded, but now received, the insufficiency of which reasons is now almost universally acknowledged.

The declarations of the testator will be either true and truly reported or misreported, or they will be false and lead to deception.

If the declarations are true and truly reported being material (and if not material, they should no more be received than any other immaterial evidence), they constitute reliable proof of more or less importance, and then exclusion is the exclusion of true, relevant and material testimony, which is an evil great in proportion to the importance of the evidence excluded, and leading to misdecision and injustice.

The danger of misunderstanding and misreporting these declarations is no other or different from that in case of confessions, &c., and it was never deemed sufficient for their exclusion, when the most stringent exclusionary rules of the common law were in force.

If the declarations are false, or declarations are reported as having been made which were never made, yet it by no means follows that injustice will ensue. The judge of fact has the same capacity to detect falsehood in this as in any and all other cases, and, if detected, the falsehood becomes an article of circumstantial evidence of no slight probative force against the party by whom it is offered. But fraud and falsehood are not to be presumed, and evidence is not to be excluded, because of its possible falsehood, for there is no species of evidence of which possible falsehood may not be predicated.

The argument for exclusion assumes that the tribunal, whose duty it is to weigh the evidence, is incompetent for the task, and that those who have never seen the witnesses, nor heard their testimony, are more competent to determine its trustworthiness before and without an hearing, than a jury would be with and after an hearing.

That the evidence, if received and relevant, would have probative force, more or less, is conceded. Exclusion is a judgment by those who know nothing of the just weight of the evidence excluded; that it is untrustworthy and false, and that those who would hear it would be unable justly to appreciate it; and, as they cannot appreciate it, they shall not hear it.

But no reason can be given why a jury cannot as justly appreciate this as any other species of testimony. To say that a more correct judgment of the trustworthiness of testimony can be found, and its truth or falsehood can be more satisfactorily determined by those who do not hear it, than by those who do, is to adopt, as an axiom, the proposition that hearing testimony incapacitates the hearer to judge of its trustworthiness and probative force.

Evidence of the declarations of a testator are received where the issue involves the question of sanity, fraud, or undue influence, as well as in cases of latent ambiguity.

But if the admissions of the declarations of a testator are intrinsically dangerous; if there is more likelihood of danger to the cause of truth from their admission than from their rejection, then exclusion should be the universal rule. No good can possibly arise from the reception of evidence preponderantly probable to produce misdecision and consequent injustice. There is nothing, when the issue involves sanity, fraud, undue influence, or ambiguity, which would change, or tend to change, evidence deceptitious in its character into evidence reliable and trustworthy. There is nothing to entitle such evidence to more credence in those cases than in the one under consideration. It may be said that it would be difficult to show the mental condition of the testator except by what he said. This may be true. But if the danger arising from his reported declarations preponderate over any and all anticipated benefit to the cause of justice, why receive such testimony? There is the same danger from admitting the declarations of a testator, that they will be misrecollected, or not being made, of their fabrication whether the issue be the sanity of the testator or his intention.

If it be said this is the only way of proving the fact of sanity, what then? If a bad way, one likely to lead to misdecision, why adopt it? Why do evil that good may come?

But then there is no difference in principle between the cases in which this kind of evidence is received and the one at bar.

As the statute directs how a will shall be made, so it prescribes as to its revocation. A will, not in accordance with the statute, is not valid. A revocation, not within its terms, leaves the will in full

force. The cancellation of a will cannot be shown by the declarations of the testator, the will being produced, for there would not be the statutory revocation. His declarations would be unavailing against a formal uncanceled will. Many of the cases relied upon to sustain the doctrine opposed to this opinion, will be found of that character.

The evidence of the testator's declarations was offered to negative the intention to destroy, and the fact of destruction of the will in question, by showing the true relation of the parties, the entire absence of intention to destroy, and hence the improbability of any destruction, intentional or otherwise, of the will by the party by whom it is conceded to have been duly made.

An examination of the cases relied upon to justify or require the exclusion of this evidence will show that they fail, in most instances, to sustain such a position.

In *Dan* v. *Brown*, 4 Cowp. 490, the will was proved. "The testator," observes Woodworth, J., "several months before his death, called for a will, and wished to add a codicil. There is no other act that indicates an intention to make the least alteration. No act was done or dissatisfaction expressed upon which to raise a presumption." This assuredly was not evidence of a revocation. The most the case decides is, that a will cannot be revoked by the mere declarations of the testator, and it is not contended that it can be.

In *Jackson* v. *Coe*, 2 Johns. 31, parol evidence was received to show the testator executed a will under duress, but not the subsequent declarations of the testator himself. The court was divided, standing three to two. The ground upon which Mr. Justice Thompson relied in his opinion was, that a revocation could not be shown by parol, and such undoubtedly is the rule.

But, if executed under duress, how could that duress be proved ? Not by the parties to it. It could hardly be expected that the parties to the duress would invalidate their own act. When freed from duress, the testator might be expected to state what had been done under such duress. It is the very source from which proof of such fact might be expected. Why not receive it ? Are not juries

competent to discriminate between genuine and fabricated proof? If not, what are they good for? Spencer, J., and afterwards chief justice, favored the admission of the testimony, citing the case of *Nelson* v. *Oldfield*, Vern. 96, where similar evidence was received, and remarking, " as well on principle as precedent, I think the evidence offered should have been admitted, and, especially, after it was proved that the devisee had been guarded and watched over, after the date of the will ; that it had been taken out of his custody and detained, notwithstanding his application for it for the purpose of canceling it, and that his children were denied access to him." Certainly, one might reasonably suppose that a testator, who had been induced to sign a will under duress or undue influence, would be as likely to state the facts when the pressure is removed, as when acting upon him in full force.

In *Jackson* v. *Betts*, 6 Cow. 377, it was held that the declarations of a testator, as to the existence of a will, and where to be found, there being proof that a will had been executed, were inadmissible, though made *in articulo mortis*. This case rests upon that of *Dan* v. *Brown*, 4 Cow. 490. The will destroyed wrongfully, how otherwise could an act of spoliation be defeated? Mr. Chancellor Walworth, in 6 Wend. 173, expressed grave doubts of the correctness of this decision. It is directly opposed to that in *Whitely* v. *King*, 112 E. C. L. 756, where declarations of the testator, that he had made his will and left it with an attorney were held properly admissible, as has been before stated.

In *Waterman* v. *Whitney*, 1 Kernan, 157, the declarations of the testator, made after the will, were offered, stating how he had disposed of his property in his will, which was entirely different from the actual disposition of it by the will in question. This evidence was excluded, and the decision turned upon the correctness of such exclusion. But no such question was raised in the case at bar. Nor was it claimed that a will could be revoked by words, the will being in issue.

In *Smith* v. *Fenno*, 1 Gallison, 170, the court admitted the declarations of the testator before and at the time of making the will, and afterwards, if so near as to be part of the *res gestæ* to show

fraud in obtaining the will, but excluded statements of his intention to alter his will.

But no one contends that the statements of an unexecuted intention are admissible, which is what is there decided.

The case of *Marden* v. *Roe*, 8 Ad. & Ell. 14, is this. " The testator, when an unmarried man, without children by his former wife, devised all his property at the time of making his will, and made no provision for any child of a future marriage. In such case, the law annexes a tacit condition that if he afterwards marries and has children, the will shall be revoked."

Evidence short of a republication cannot be received in a court of law to show that the testator meant his will to stand good, notwithstanding the subsequent marriage and proof of issue.

" The broad question," remarks Tindall, C. J., " therefore, which has been argued between the parties, is whether the evidence of the testator's intention, that his will shall not be revoked, is admissible to rebut the presumption of law, that such revocation shall take place ? And we all concur in the opinion, that the revocation of the will takes place in consequence of a rule, or principle of law, independently of any question of intention, and, consequently, that no such evidence is admissible."

In other words, the will was revoked by the subsequent marriage and birth of a child, and being revoked, it could only be made valid like any other will. It ceases to be a question of intentional revocation. The will is *ipso facto* revoked. It is not a question of presumption, if it were, one presumption might be rebutted by another.

A will revoked by operation of law is as if it had never been made. To give it vitality, it must be republished "with all the solemnities required by the statute," and this cannot be done by parol. 1 Redfield on Wills, 373 (14). Hence it is apparent that this decision has no bearing upon the question under discussion.

In *Doe* v. *Allen*, 12 Ad. & Ell. 451, parol evidence of the delarations of the devisor, that she had left her property to the grandson, who had only one brother and sister, were held admissible to show which grandson should take under the devise, and it was held no

objection that the declarations were subsequent to the making of the will. Lord Denman, C. J., remarked, "The only remaining point is, whether the time when those declarations were made, viz., some months after the will was executed, makes any difference. Cases are referred to in the books to show that declarations contemporaneous with the will are alone to be received; but on examination, none of them establish such a distinction. Neither has any argument been adduced which convinces us that those subsequent to the will ought to be excluded, whenever any evidence of declaration can be received."

In *Stevens* v. *Vancleve*, 4 Wash. 462, the same law is recognized as applicable to a will as to a deed. But such is not the case. By the delivery of a deed, the title passes to the grantee. By the making of a will, nothing passes at the time. The estate remains as before. It may be conveyed. It remains subject to any disposition the owner may choose to make up to the time of his death. Until that time he alone had an interest in its disposition. The declarations of a party in relation to his own property stand on a different footing from those relating to that conveyed by him to others, whose rights have become vested.

The case of *Doe* v. *Palmer*, 16 Ad. & Ell. N. S. 707, applies to alterations apparent on the face of the will, and establishes the law thus; that they are presumed to be made after the will is executed, until evidence to the contrary is shown; that the declarations of the testator before the execution of the will were admissible evidence from which the jury might infer that they were made before the execution, since the alteration was in furtherance of an intention shown to have existed before the execution of the will; and that declarations after the will was made, tending to show that the alterations had been made before, were inadmissible.

That is to say, from the declarations of the testators, before the execution, it may be inferred, that the alterations were made in furtherance of such expressed intention; but if they were made after its execution, they are not admissible to show that such intention had been carried into effect.

In *Provis* v. *Reed*, 5 Bing. 435, the declarations of a testator, in

subversion of his will, were not received. The declarations were, in substance, that he had signed a paper, and that it was not worth one farthing, &c. It was really offering the judgment of the testator, to determine the validity of a will.

In the case at bar, the evidence of the declarations of the testator were received, to show his state of mind in reference to his wife, and thus to disprobabilize the fact of his intentional cancellation of his will. The decisions relied upon as sustaining an adverse doctrine, apply generally to a different state of facts, and rest on different principles.

In the deposition of one Kimball are found a question and answer, to which objections were made when the deposition was taken. At the trial, when the appellant's counsel came to the question and answer referred to, the respondent's counsel renewed the objection, saying, "that is objected to." The question was read, and the presiding judge overruled the objection, and allowed it to be read to the jury; and the counsel then read the answer also to the jury. After it was read, the presiding judge said to the counsel, that the answer was inadmissible; but as it had been read to the jury he could not exclude it, that he could do no more than to instruct the jury to disregard it, and that he thought his duty to both parties required him to do it. But no such instructions were given, except in the remark to counsel as above stated.

The question proposed was proper. The ruling of the presiding judge, in permitting it to be read, was correct. He might well presume that a proper answer would be made to a legal inquiry.

The answer, however, was not admissible. The attention of the judge was not called to it, by presenting it to him for examination. Upon its being read, and being perceived to be illegal testimony, the presiding judge at once stated to counsel that the answer was inadmissible, and that he should direct the jury to disregard it. This was in the presence and hearing of the jury. It was a substantial instruction at the time. It must be presumed the jury regarded it. In *Tapley* v. *Forbes*, 2 Allen 20, " The declarations of the insolvent," remarks Bigelow, C. J., " made subsequent to the sale, were clearly incompetent ; but the error of admitting them

Collagan *v.* Burns.

was afterwards cured by the explicit statement, in the hearing of the jury, that they were to be disregarded by them." In *Hawes* v. *Gustin*, 2 Allen, 403, Dewey, J., uses the following language: "If any error was committed by the presiding judge, in allowing the mother, in the first instance, to testify to this fact, it was at once corrected, and the answer of the witness as to the inquiry stricken out; and the jury were instructed not to regard this as a part of the evidence in the case."

It frequently happens, in the trial of causes, that to a pertinent and proper question an answer is made, which, by law, is inadmissible. What, in such case, is the judge to do? To strike out the answer, as in the English practice, or, as is equivalent in ours, to direct the jury to disregard it, or at once to discharge the jury from the consideration of the cause. Unless a direction to the jury to disregard evidence, which is not properly before them, as in the cases referred to, or in the one at bar, is to be deemed sufficient, it becomes the duty of the judge, upon the reading or the hearing of the answer, immediately to withdraw the cause from the jury. The judge, in the case before us, should, if this be law, have terminated the trial, and a new jury should have been impanelled.

If the caution to the jury, uttered at the time, was not deemed sufficient, and the presiding judge omitted to present the matter again to the jury, the counsel for the appellees should have called his attention to the subject, and have requested a more peremptory instruction. They are not to neglect this, and then if a verdict is against them, take advantage of what might have been so easily remedied. "If," remarks Bigelow, C. J., in *Tapley* v. *Forbes*, 2 Allen, 20, where a similar question arose, "the defendant wished for a more distinct instruction on this point, it was his duty to have asked it." *Moore* v. *Ross*, 11 N. H. 547. So, when evidence is received with proper limitations, but those limitations are not repeated in the charge to the jury, and counsel neglect to call the attention of the court to such omission at the time, it is too late for them to object, because of it, after the verdict. *Lee* v. *Lamprey*, 43 N. H. 13. *Goodrich* v. *Eastern Railroad*, 38 N. H. 391.

There being a subsisting verdict in this case, and a majority of the justices qualified to sit not concurring in sustaining the exceptions, there must, in accordance with Pub. Laws of 1870, be

*Judgment on the verdict.*

KENT, BARROWS, and TAPLEY, JJ., concurred.

WALTON, J. A relaxation of the well-established rule of law, excluding hearsay evidence, has, in my judgment, enabled fraud and perjury to do a successful work in this case. How this estate (large though it is) shall be distributed ; whether it shall all go to a childless widow, or whether the city of Portland, and the Widow's Wood Society, shall receive such portions of it as the testator designed, are questions comparatively of little moment. But whether there shall be such a relaxation of the rules of evidence as will not only make the fraud attempted in this case successful, but will also make such frauds easy in the future, is a question of the gravest importance.

The evidence is not reported in full, but I know its character, for the case was once tried before me ; and I have no hesitation in saying that it is my firm belief that an old will, which the testator had revoked and torn into fragments, has been pasted together, and is now presented for probate, while a later and legally executed will is fraudulently suppressed.

By the admission of evidence of the pretended declarations of the testator, that his wife's mother tore the will, and that he pasted it together (evidence in the highest degree improbable), a verdict in favor of its validity was obtained.

Were these pretended declarations legally admissible ? I think not. They were not admissible as the admissions of a party to the suit, for the testator was not a party. Nor were they admissible as *res gestæ*, for they accompanied no act of making, republishing, or revoking the will offered for probate. Nor were they admissible to show the mental condition of the testator, for no such question was in issue. They purport to be statements of what had been done in the past, their probative force depending entirely upon the sup-

posed truthfulness of the narrations. As such, they were mere hearsay, and clearly inadmissible.

Judge Redfield has examined, very fully and very ably, the admissibility of such evidence. He says it is certain that the declarations of the testator are not admissible for the purpose of proving any distinct fact, depending upon the force of the admission, since the testator is not a party to the question of the validity, or interpretation of his will. 1 Redfield on Wills, c. 10, § 39, pl. 1.

The same doctrine is laid down in Greenleaf on Evidence, 10th ed. vol. 2, § 690, note 3.

And the learned editors of the American Leading Cases, in the later editions of the work, have stated the law upon this subject very clearly and accurately. They say: "It must be remembered that although the declarations by which the testator accompanies a symbolical revocation of his will, as by burning, canceling, or obliterating it, are admissible in evidence as part of the *res gestæ*, and proof of the animus with which he acts, yet prior or subsequent declarations will be wholly inadmissible, either to prove or negative a revocation; or for any other purpose than that of showing his mental condition at the time when they were uttered, and thus throwing light on what it was at the time when the will was revoked." 2 Am. L. C., 4th ed. 688.

Since this case has been before us, the admissibility of such declarations has been thoroughly examined by the supreme court of Massachusetts, and, fortunately for the cause of truth and justice in that State, the conclusion of the court was that the declarations of a testator, when offered as a narrative, for the purpose of proving a distinct fact, are not legal evidence. Pretended declarations of the testatrix were offered in evidence in that case, to prove the fact of undue influence. The court say, that, for such a purpose, "they are mere hearsay, which, by reason of the death of the party whose statements are so offered, can never be explained or contradicted by him; and obtained, it may be, by deception or persuasion, and always liable to the infirmities of human recollection, their admission for such a purpose would go far to destroy the security which

it is essential to preserve," and that "by the better reason and the most authoritative decisions," they are not admissible ; that " statements and declarations, when the state of the mind is the fact to be shown, are received as mental acts or conduct ; that the truth or falsity of the statement is of no consequence ; that, as a narration, it is not received as evidence of the fact stated ; that it is only to be used as showing what manner of man he is who makes it." *Shailer* v. *Bumstead,* 99 Mass. 112.

The admissibility of such evidence was very fully examined in *Comstock* v. *Hadlyme,* 8 Conn. 254 ; and again in *Waterman* v. *Whitney,* 11 N. Y. (1 Kernan), 157.

In the latter case the court say, that upon a question of revocation, no declarations of the testator are admissible except such as accompany the act by which the will is revoked ; that the only decision to the contrary is *Durant* v. *Ashman,* 2 Rich. (So. Car.), 184 ; and that the case is in conflict with authority as well as principle ; that the fact to be proved in such cases is the act claimed as a revocation, together with the intent with which it was done ; and all declarations of the testator which do not accompany the act, are to be regarded as mere hearsay, and treated as such.

These authorities establish the proposition, that when the alleged declarations of the testator are offered as an admission or statement of a past transaction ; or, as the rule is stated by Judge Redfield, when such testimony is offered for the purpose of proving any distinct fact, depending upon the force of the admission ; or, as stated in the American Leading Cases, when such declarations are offered to prove or negative the revocation of a will, or for any other purpose than that of showing the mental condition of the testator at the time when they were uttered ; or, as stated by the supreme court of Massachusetts, when offered as a narration,—they are mere hearsay, and not admissible.

It seems to me that the opinion of the chief justice (long and elaborate as it is) nowhere meets this objection. It shows clearly enough, what no one disputes, that for some purposes the declarations of the testator are admissible. But it nowhere meets, singly

Collagan *v.* Burns.

and distinctly, the question of the admissibility of such declarations when offered, as in this case, for the purpose of proving distinct facts, which occurred, if they ever occurred at all, long prior to the time when the supposed declarations were made.

"I heard the testator say his mother had been making a fuss, and had torn his will." "I heard the testator say the old woman had got in one of her tantrums, and had torn it." "I heard the testator say his mother had torn it in one of her tantrums." "I heard the testator say he had repaired it so that it was just as good as ever." "I heard the testator say he had given Sarah (his wife) all his property." "I heard the testator say that all he possessed was Sarah's, and he wished it was more." "I heard the testator say that Mrs. Collagan had been untiring in her devotions, night and day, and that there was nothing she could do for him that she had not done." "I heard the testator say that all he possessed was Sarah's, and that she had been a faithful wife, untiring in her attentions." "I heard the testator say he had willed everything to Sarah, that she had done everything for him, night and day, and he did not know as he appreciated her so much as he ought to."

Such is the character of the declarations which were admitted in evidence in this case. They were not offered to show the mental condition of the testator at the time they were uttered, for no such question was raised. And they accompanied no act pertinent to the issue, and do not purport to be in explanation of any act then being done, and were not therefore admissible as *res gestæ*. In the main, they are simple narrations or statements of what had been done in the past. What are not of that character seem to possess no other force than to create prejudice in the minds of the jury, and thus unfit them for a candid investigation of the case.

To such as believe that the statute for the prevention of frauds and perjuries is a relic of barbarism, and that all kinds of hearsay evidence ought to be admitted in our courts of justice, the admission of these declarations will not appear objectionable. But to those who believe that the rule excluding hearsay evidence is founded in practical wisdom, and that such testimony, if admitted, will

oftener lead to error than truth, such a relaxation of the law will appear unfortunate, and, as the verdict in this case well illustrates, better calculated to defeat than to promote the ends of justice.

*Jackson* v. *Betts*, 6 Wend. 173, often cited as an authority for the admission of such evidence, is erroneously reported. The reporter's abstract, as printed, and copied into Jarman on Wills, and other text-books, states that, upon a question of revocation, the declarations of the testator, during his last sickness, are admissible in evidence. This is erroneous. No such point was decided. When the case was before the supreme court, it was decided that such evidence was not admissible; and such is the settled law in New York at this day. See *Jackson* v. *Betts*, 6 Cowen, 377, and *Waterman* v. *Whitney*, 11 New York (1 Kernan), 157.

The error above referred to has undoubtedly been the cause of much of the confusion and apparent conflict to be found in the books upon this subject.

Judge Washington says, that nothing could be more dangerous than the admission of such evidence. *Stevens* v. *Vancleve*, 4 Wash. C. C. 265. Judge Story says, that such evidence is exceedingly suspicious, of very easy fabrication, and yet of very difficult refutation, and ought not to be allowed one jot beyond what the authorities have already decided. *Smith* v. *Fenner*, 1 Gallison, 170. Chief Justice Best says, that if such evidence were admitted, witnesses would constantly be brought forward who would swear to enough to set aside the most solemn instruments. *Provis* v. *Reed*, 5 Bing. 435. Such is my belief. Once open the door to such evidence, and, in my judgment, more falsehood than truth will pass through. I am, therefore, in favor of keeping it closed.

In my judgment, the exceptions should be sustained and a new trial granted.

CUTTING, DICKERSON, and DANFORTH, JJ., concurred.

DICKERSON, J., expressed his views as follows:

There is no ground for admitting many of the declarations of the testator in question, as part of the *res gestæ*, since they did not

accompany any act of his, in relation to the will. So far from this, the declarations, for the most part, were not made of or concerning the will in any respect whatever.

It is observable that no question is raised of the competency of the testator, or of any undue influence exercised over him in making his will, or of other fraud or deception practiced upon him in that transaction.

The only ground upon which it is claimed that the declarations are competent evidence is, that they tend to rebut the presumption of revocation arising from the spoliation of the will. In order to make such an act of the testator a revocation, there must be an intention to revoke accompanying it; the act of cancellation and the intention to revoke must be simultaneous. But to make the declarations admissible evidence upon this question of intention, it should clearly appear that they have the tendency claimed, and are legally admissible because of such tendency. However important it may be to prove the intent with which the will was mutilated, it by no means follows that every kind of evidence, tending to show that, is admissible. The fact of intention must be established by legal evidence; it cannot be proved by hearsay any more than any other fact.

The question is thus distinctly presented, whether the declarations of a testator, made long after the alleged revocation of his will, and not of or concerning that act, or the will itself, or the disposition of his property, but relative to the general character of the domestic relations subsisting between himself and the object of his bounty, are competent evidence upon the question of revocation. The statement of this question can scarcely fail to elicit from ordinary legal minds an emphatic negative, and, at once, to throw the *onus* of showing the competency of such declarations upon the party asserting it.

Such declarations cannot of themselves affect the interests of the testator, or his heirs or devisees, as he cannot revoke his will by parol. He has, therefore, no interest to declare the truth, and is not in the situation of the grantor in a deed, who makes declarations respecting his title, which, if made while he is the owner, and

in disparagement of his title, are receivable in evidence touching the claim of his grantee.

The argument in favor of the competency of such evidence, as-. sumes that the state of the testator's mind upon the subject in question, and the circumstances of his pecuniary condition, were the same when the declarations were made, as when the will was mutilated. But what rational assurance can there be that this was so? How can it be determined that age, disease, the loss of friends, or other misfortune, or the influence of favorites, or designing and interested parties had not, in the interval, wrought a change in his feelings toward his wife, or that she had not, during that period, rendered herself more worthy of his adulation than formerly?

But *non constat* that, if there had been no change in his feelings toward her between the two occasions, he did not revoke his will, or would not have been likely to do it. A change had taken place in his pecuniary circumstances between the time of making the will and the alleged act of revocation. Her dower in his estate, at the latter period, probably exceeded his whole estate in value when he made his will; and he might, therefore, have revoked it, not only with the kindest feelings toward her, but from a sense of justice toward others whose claims upon his favor could not have been met when his will was made, without injustice to her.

Amidst these, and a thousand other varying considerations, operating upon the mind of the testator, with what rational confidence can it be asserted that his declarations of affection for his wife, made long after his will had been mutilated, legally tend to show, that, if he committed that act of spoliation, he did not do it *animo revocandi*.

Many of the declarations admitted in evidence, not only did not accompany the act of cancellation itself, or relate to his will, or the disposition of his property, but were mere loose talk about his wife's attentions to him and his affection for her, declarations, as has been seen, by no means necessarily inconsistent, but actually reconcilable with an act of revocation. To admit such declarations seems to me

to be repugnant to well-established rules of evidence, and to abolish the clearly defined and uniformly recognized distinction between direct and hearsay evidence. If such declarations are admissible upon the question of revocation, pray what declarations of the testator are inadmissible ?

In passing from principle to authority I fail to find, in the cases cited by my associates in favor of admitting such testimony, a single one that goes to the extent claimed. In all of them, the declarations admitted were made of, or concerning the will itself, the alleged act of revocation, or the disposition of the testator's property ; or they were admitted upon the question of the testator's competency, of undue influence, or of fraud in making his will, topics clearly different and distinct from the subject-matter of the declarations under consideration.

On the contrary, the authorities cited by my associates against the admissibility of such testimony, clearly show that it has been uniformly excluded, and that testimony far less objectionable has been held inadmissible upon the question of revocation, by courts of the highest authority. I cannot consent to a relaxation of the rules of evidence so repugnant to reason and contrary to authority.