# THROCKMORTON v. HOLT.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 21. Argued December 7, 10, 1900.—Decided March 25, 1901.

At the trial of this case before the jury, the main issue was upon the validity of the will of Adjutant General Holt. Tecumseh Sherman, a son of General Sherman, was called to prove that the signature of his mother as a witness was genuine. He was not inquired of as to the genuineness of the signature of his father, because his uncle, Senator Sherman, had testified that that signature was genuine. Subsequently Mr. Randolph testified that he was familiar with the signature of General Sherman, giving his sources of knowledge, and that he was of opinion, (giving his reasons for it,) that it was not his signature. Tecumseh Sherman was recalled to prove that the objection found to the signature of his father was not an unusual feature in his signature, but the court, on objection, excluded the evidence. *Held*, that the evidence was competent as rebuttal, and should have been received.

It is the general rule that if evidence which may have been taken in the course of a trial be withdrawn from the consideration of the jury by the direction of the presiding judge, such direction cures any error which may have been committed by its introduction; but there may be instances, (and the present case is one,) where such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission, and in that case the general objection may avail on appeal or writ of error. There may also be a defect in the language of the attempted withdrawal. In such a case, and under the particular facts in this case, the names of the witnesses should have been given, and the specific evidence which was given by them, and which was to be withdrawn should have been pointed out.

The opinion of a witness as to the genuineness of the handwriting found in a paper, based in part upon his knowledge of the character and style of the composition and the legal and literary attainments of the individual whose handwriting it purports to be, are not competent to go to the jury upon the question raised in this case.

Declarations, either oral or written, made by a testator, either before or after the date of an alleged will, unless made near enough to the time of its execution to become part of the *res gestæ*, are not admissible as evidence in favor of or against the validity of the will.

If not admissible generally, they are inadmissible even as merely corroborative of evidence denying the genuine character of the handwriting.

No presumption of revocation of the will by the testator, or under his di-

rection, arises from the appearance of this will when first received by the register of wills. There must be some evidence of an act by the deceased, or under his direction, sufficient to show the fact, or the instrument must have been found among the papers of the deceased, mutilated, torn or defaced, under such circumstances that the revocation might be presumed.

As the production of the will in this case created no presumption of revocation, it was necessary to prove that the act of mutilation was performed by him or by his direction, with an intention to revoke, and his declarations, not being part of the *res gestæ*, cannot be used for that purpose.

THIS was a proceeding in the Supreme Court of the District of Columbia for the purpose of proving an alleged will of the late Joseph Holt, a distinguished lawyer and for many years Judge Advocate General of the United States Army, who died at the age of eighty-seven, in Washington on August 1, 1894, after a residence of many years in that city. The proceeding resulted in the rejection of the paper on the ground that it was not the will of Judge Holt but was a forged document, and judgment refusing probate was entered upon the verdict of the jury. The proponents of the will appealed to the Court of Appeals of the District, but before the appeal was brought on for argument Miss Hynes, one of the legatees named in the will, withdrew her appeal. The judgment of the Supreme Court upon the appeal of the other proponents was subsequently affirmed by the Court of Appeals, and the proponents of the paper, excepting Miss Hynes, have brought the case here by writ of error.

The record shows that Judge Holt died leaving no relatives nearer than nieces and nephews, residents of the States of Indiana, Mississippi and Kentucky, and of the city of Washington, D. C., all being respondents in this appeal. He had been twice married and both wives had died long prior to his own demise. He had no children by either wife. Immediately upon his death his nephews, Washington D. Holt and William G. Sterrett, came to his late residence in Washington, and the keys being delivered to them by one of the servants, a strict search was made for a will but none was found. While the nephews were in possession of the house and the search was going on for the

will, papers were burned and destroyed, all of which the nephews testified were wholly unimportant, and consisted of letters from relatives of Judge Holt to him, and that no papers destroyed were of a testamentary character. · No will having been found, the nephews above named, and another, named John W. Holt, filed a petition in the Supreme Court of the District of Columbia, holding a special term for orphans' court business, in which the fact of intestacy was stated and the appointment of an administrator was asked. Pursuant to the petition and on September 28, 1894, the National Safe Deposit, Savings and Trust Company of the District was appointed administrator of the estate, and has continued so to act since that time.

Up to August 26, 1895, nothing out of the ordinary occurred in the administration of the estate, but on the last mentioned date a sealed envelope, addressed to the register of wills in Washington was received by that officer, which envelope was postmarked " Washington, D. C., August 24, 6 p. m. 1895, L." The envelope was opened by the register who found therein a paper purporting to be a will signed by "J. Holt," dated February 7, 1873, and on the paper appeared what purported to be the signatures of Ellen B. E. Sherman, U. S. Grant and W. T. Sherman as witnesses. By this paper Judge Holt gave one half of his estate to Lizzie Hynes, her real name being Elizabeth Hynes, and the other half to Josephine Holt Throckmorton.

Lizzie Hynes had been left an orphan in infancy and had been committed to the care of her uncle, Dr. Harrison, and his daughter, the first Mrs. Holt, and she had taken special charge of the child up to the time of her own marriage to Judge Holt, who had promised his wife at the time of their marriage to care for the child, and Mrs. Holt upon her deathbed asked and received a promise from Judge Holt that he would always take care of Lizzie, and treat her as if she were his own daughter. From that time until his death, Judge Holt fully and in all things kept his promise and always supported her, she living most of the time in Kentucky, though frequently visiting and traveling with him.

The other beneficiary, Miss Throckmorton, was Judge Holt's goddaughter, her mother being the cousin of his second wife, and

while her father was a young man Judge Holt treated him with great kindness, and always so treated Miss Throckmorton.

The following is the text in full of the alleged will, with punctuation as in the original:

" In the name of God  Amen

" J, Holt, of the City of Washington D. C. being of sound mind declare this to be my last will & Testament

" I do hereby give devise & bequeathe all of my property—both personal & real to Lizzie Hynes—cousin of my first wife & to Josephine, Holt, Throckmorton—who is my God-child & to their heirs & assigns forever—I do hereby direct that at my death all of my property be divided equally between them.—

" Lizzie Hynes is to inherit hers at my death Josephine at the age of 21, her father Maj. Charles B. Throckmorton will hold her share in trust—

" I appoint Mr Luke Devlin of the city of Washington D. C. whose character I believe to be of the highest standard & who will I am certain carry out my wishes my executor

" Signed & sealed by me in the presence of these witnesses in the City of Washington, D. C.

" Feby 7th 1873—

J. HOLT

" ELLEN B. E. SHERMAN

" U. S. GRANT

" W. T. SHERMAN "

There was nothing in the envelope addressed to the register of wills other than this paper. The postmarks on the package indicated that it had been deposited in one of the many local mail boxes to be found in the northwest quarter of the city of Washington, which is quite a large district, running from North Capitol street on the east to Georgetown on the west, and bounded on the south by the Mall and north by the boundaries of the city. When the paper was taken from the envelope it bore evident signs of mutilation by burning and tearing, and although the paper recited that it was signed and sealed, there was no seal on it, and if it ever had been affixed it had been torn away. At the time the paper bears date, February 7, 1873, Ellen B. E. Sherman was the wife of W. T. Sherman, who

was then the general commanding the army of the United States, and U. S. Grant was then President. The paper was torn nearly in two across the page between the signatures of the testator and that of the first witness. Some of the evidence tended to show that the tearing was complete, but, as stated by the court below, the weight of the evidence was that it was not entirely separated at one end. The burning appeared on the edges of the paper and at the top, but the body of the instrument was so far intact as to be plainly legible.

Upon the receipt of this paper by the register of wills he communicated with Mr. Luke Devlin, the person named therein as executor, and after the latter had seen it he communicated with the parties interested, and on September 20, 1895, filed his petition in the Supreme Court of the District of Columbia, held for orphans' court business, for the probate of the paper as the last will and testament of Joseph Holt, deceased.

The contestants, as next of kin, filed their caveat October 18, 1895, opposing the probate of the paper, to which answer was made and filed December 2, 1895, by Luke Devlin, the executor, and by the Misses Hynes and Throckmorton, the two legatees named in the paper.

Issues were duly made up in the orphans' court and transferred to the Circuit Court for trial by jury. They are as follows:

"1. Was the paper writing bearing date the seventh day of February, A. D. 1873, which was filed in this court on the 26th day of August, A. D. 1895, executed by the said Joseph Holt as his last will and testament?

"2. Was the execution of said paper writing procured by fraud exercised and practised upon said Joseph Holt by any person or persons?

"3. Was the execution of said paper writing procured by the undue influence of any person or persons?

"4. If the said paper writing was executed by the said Joseph Holt as his last will and testament, has the same been revoked by said testator?"

Upon the trial of these issues the proponents of the paper proved the death of the subscribing witnesses, and gave evi-

dence in regard to the genuineness of their signatures as well as of Judge Holt's. Senator John Sherman testified to the genuineness of the signature of his brother, General Sherman; Colonel Frederick D. Grant to that of his father, President Grant, and P. Tecumseh Sherman to that of his mother, Mrs. Ellen B. E. Sherman. Mr. Henry B. Burnett testified that in his opinion the body of the will and the signature of the testator were written by Judge Holt; that he became acquainted with him in 1863; had frequently seen him write and had had considerable correspondence with him which continued up to 1889, and that he was familiar with his handwriting. After this evidence was given counsel for proponents offered the paper in evidence, which was objected to by counsel for the contestants on the ground that the paper was evidently separated into two parts; that it purported to be under seal, and the seal, if it ever bore one, had been torn away; that it appeared to have been burned and mutilated, and had been sent to the register of wills anonymously, and that it was incumbent upon proponents to explain these circumstances before the will could be read to the jury. The objection was overruled and the paper read in evidence.

Elizabeth Hynes, one of the legatees and proponents, was called and testified that the paper writing was never in her possession, and she never saw it until it was shown her on the witness stand at the trial.

Miss Throckmorton also testified that she had never had the paper in her custody and had never seen it until it was shown her by the register of wills in the latter part of October, 1895, and that the first she knew of its existence was through a telegram from Mr. Devlin, which she received in New York city, August 26, 1895; that she had known Luke Devlin when she was a child but had not seen him since until after the paper was filed.

Mr. Devlin, the person named as executor in the paper writing, also testified that it was never in his possession, and that he first saw it in the office of the register of wills on the day it had been received there. On cross-examination Devlin testified that he knew Joseph Holt well since 1862, having been a copyist

and messenger at that time in the office of the Judge Advocate General when Judge Holt succeeded to that office; that he continued to be employed in that office until 1876, when Judge Holt retired therefrom; that he had little communication with him in relation to office matters; that he visited Judge Holt once or twice at his house; that he was in the habit of meeting him socially at the residence of Mrs. Throckmorton, Sr., the grandmother of Miss Josephine H. Throckmorton, from 1865 to 1878; that he had not seen Mrs. Throckmorton, Sr., more than four or five times during a period of ten years preceding the receipt of the will at the register's office, and on learning of the existence of the will he had to consult the city directory to ascertain where she then lived; that on the day the will reached the register of wills he received a telephone message from the register, went to his office, and saw the will for the first time. He called on Mrs. Throckmorton, Sr., and on the same day telegraphed Miss Josephine H. Throckmorton of the finding of the will, having first learned her address from her father upon inquiry at the War Department; that he called on several occasions in later years at Judge Holt's house, and was informed by the colored servant that he was out or that he was engaged, and asked witness to call again, the last of these visits being about April 9, 1894, shortly before his death; that he had met Judge Holt outside on several occasions, the last of which was about two years before his death, and conversed with him.

At this point the proponents announced their *prima facie* case closed, but opposing counsel objected that it was incumbent upon the proponents to put in all their testimony essential to the establishment of the alleged will before contestants were called upon to offer any; whereupon the court ruled that because of the fact that there was no attesting clause to the will, it was proper and necessary for the proponents to offer all the evidence they proposed to offer upon the subject of the genuineness of the signature of Joseph Holt to the will, and counsel for the proponents accepted the ruling as being a matter within the discretion of the court.

Testimony was then given by Elizabeth Hynes, who stated that she had corresponded with Judge Holt for forty years,

and that in her opinion both the body of the will and the signature were in his handwriting. Mr. Devlin testified that he had had daily opportunity for thirteen years of becoming familiar with Judge Holt's handwriting, and that the signature to the instrument was undoubtedly in testator's handwriting.

Miss Throckmorton testified that she had corresponded with him, and was familiar with his handwriting and knew his signature, and that both the will and the signature were in the handwriting of Joseph Holt.

Other witnesses were called, who testified that they were acquainted with the handwriting of Judge Holt, and that in their opinion the body of the paper and the signature were in his handwriting; after which the proponents rested.

Counsel for the contestants then offered in evidence the deposition of John Judson Barclay, in which the deponent testified that he knew the testator intimately from 1857 to 1866, and at intervals thereafter until the time of his death, and that he had last seen him in November, 1893, when he was in impaired health and in a darkened room, at which last stated time he had a conversation with Judge Holt in regard to the disposition by him of his property and estate. Evidence in regard to this conversation was duly and fully objected to, and the objection overruled and an exception taken by the proponents. The witness then stated the conversation as follows:

"In our conversation he referred most touchingly to my deceased sister, Mrs. Sarah Barclay Johnson, and made many kind inquiries in regard to my aged mother, who had also been his warm personal friend for many years. In this connection he remarked, 'I have made my will and have made provision for her to receive some pictures,' etc., which my sister had painted for him, as well as an ambrotype or photograph of herself, which he highly prized and wished my mother to possess."

Another witness, Mrs. Briggs, testified under proper objection and exception that she had had a conversation with Judge Holt relating to wills some time between 1888 and 1891, in which he told the witness that if she were going to make a disposition of any piece of her property to do it before she

OCTOBER TERM, 1900.

passed away; then she would be sure that it would be done and be permanent; but, he continued, "in my own case my nephew, my brother's son, will attend to my affairs, and I know it will be done all right." Before the conversation ended Judge Holt had stated that it was his nephew, Washington Holt, and that he would attend to his affairs, and he knew it would be all right.

The objection to this testimony was on the ground that, if it tended to prove anything, it could only mean that there was a will existing in which Washington Holt was named as executor, and that if offered for the purpose of proving the contents of such will its execution could not be proved by mere declarations of the testator, and also that the legal presumption was that as the will was not produced or found it had been revoked. If not revoked it must be produced, and that parol declarations of this character are inadmissible as a basis for proving revocation. Counsel for the contestants admitted that their claim was that there was a will existing in which Washington Holt was executor, but at the same time counsel stated that they wished it understood that the evidence was also offered both on the question of forgery and on the question of revocation of the alleged will of 1873. The objections were overruled and the testimony admitted and exceptions duly taken.

Subject to the same objections and exceptions, counsel for the contestants further gave evidence to the jury tending to prove that between the years 1884 and 1893 Judge Holt, on several occasions, told Washington D. Holt that he had made him (Washington Holt) his executor, and on several occasions Judge Holt informed Mary Holt and her mother Vanda Holt that they would be much better off after his death; that they would then go to Europe, and Mary must become proficient in French so that while in Europe she could act as their interpreter. Evidence was also given that during the same period Judge Holt told the servants of his house on two occasions that Washington D. Holt would have charge of his affairs after his death.

It was also proved that Judge Holt was born in or about the year 1807, in the State of Kentucky, and that until 1856 he lived there, excepting a few years when he practiced law in

Mississippi; that he died in the city of Washington in August, 1894, leaving an estate of about $180,000, about $40,000 of which consisted of real estate in the city of Washington; his mother died in 1871, previous to the date of the alleged will, February 7, 1873.

During the war it would appear that there was some bitterness of feeling engendered in Judge Holt's mind by the part taken by his relatives, most of whom favored the South, and some of whom entered its military service. Evidence was also given on the part of contestants tending to prove that Judge Holt, prior to February 7, 1873, had on several occasions received visits at his house in Washington from some of his nieces and nephews, and had kindly received them and spoken kindly of them to others after they had gone.

Letters of his were received in evidence, without objection, dated prior to February 7, 1873, directed to different relatives in Kentucky, and tending to show pleasant relations between them, while letters of a similar nature from him to those relatives, dated subsequently to February 7, 1873, and up to within a few years prior to his death in 1894, were admitted, but under an objection and exception as to their competency. Evidence was also given, subject to similar objections and exceptions, of declarations of an unfriendly character on the part of Judge Holt towards the father of Miss Throckmorton, and also towards her grandmother, the evidence tending to show that he had said some time after the date of February, 1873, that the Throckmortons were his enemies, and that at a reception given by President Arthur, Judge Holt had refused to shake hands with Major Throckmorton, the father of Miss Josephine; also declarations of his to his servants that he would not see the Throckmortons, these declarations having been made many years subsequently to February, 1873.

All of this class of evidence was offered by the contestants in support of their allegation that the paper was a forgery as well as upon the issue of revocation.

There was also evidence given on the part of the proponents tending to show that Miss Throckmorton was a great favorite of Judge Holt's, and that his feelings of affection for her had

never changed, notwithstanding he may have felt differently towards her father and grandmother. She was his goddaughter, and she testified (after the evidence above referred to on the part of contestants) that she frequently visited and stayed at Judge Holt's house, and in 1892 he told her that he was an old man, on the brink of his grave, but that he had provided for her, and that she would be perfectly independent, and that was the last time she ever saw him; that he never spoke to her at any time otherwise than kindly and with affection.

Letters indicative of interest and affection for the mother of Miss Throckmorton were put in evidence by proponents, after evidence of that character had been given by contestants, in relation to the relatives of Judge Holt.

Other evidence was given upon the trial not necessary now to be referred to.

To the question whether the paper filed in court on August 26, 1895, was executed by Joseph Holt as his last will and testament, the jury answered " No."

To the fourth question, whether, if the paper had been executed by Joseph Holt as his last will and testement, the same had been revoked by him, the jury answered " No; because it was not executed."

No evidence having been given in relation to matters referred to in the second and third questions, the jury by direction of the court returned a negative answer.

*Mr. William G. Johnson* and *Mr. Calderon Carlisle* for plaintiffs in error. *Mr. J. J. Darlington* and *Mr. George C. Fraser* were on their brief.

*Mr. A. S. Worthington* and *Mr. J. M. Wilson* for defendants in error.

MR. JUSTICE PECKHAM, after making the above statement of facts, delivered the opinion of the court.

Before proceeding to a discussion of the more important questions involved in this case we will refer to two decisions of the

trial court upon questions of evidence, in which we think there was error.

The witness, P. Tecumseh Sherman, had been called by the proponents of the will for the purpose of proving the signature of his mother, Mrs. Ellen B. E. Sherman, and had stated that in his opinion the signature on the paper was genuine. He did not testify as to the genuineness of the signature of his father, as Senator John Sherman, the brother of the General, had testified that in his opinion the signature was genuine. Subsequently, when the case was with them, the contestants called as a witness John B. Randolph, who, after testifying that he had been employed for more than thirty years in the office of the Secretary of War, and that he was so employed while General Sherman had acted as Secretary and also when he had been General of the Army, testified that he was familiar with the signature of General Sherman, and had recently reëxamined the signature on the paper in question, and that in his opinion the signature was not that of General Sherman. Upon cross-examination he was asked his reason for that opinion, and among others stated that in the genuine signature of General Sherman in the long quirl on the capital T the upper and lower lines meet; that he never saw one in which they did not meet, and he had seen thousands of them. In response to a further question on cross-examination he said that the upper and lower lines met at least in four out of five signatures. He also stated that another reason for his belief that the signature was not that of the General's was that the S in Sherman differed from the genuine S in the little stroke at the lower part of that letter where the upward stroke crosses the staff; that it should not make so much of a loop or so pronounced a loop as in the paper.

The proponents in rebuttal called as a witness P. Tecumseh Sherman, who had already been sworn in relation to the handwriting of his mother, and by him they offered to prove that this failure of the lines to meet in the letter T was by no means an unusual feature in the signature of his father, General Sherman, and that it was frequently, if not habitually, found therein, and also that the loops at the bottom of the S; as large as that

in the signature to the paper, were also usually found. The court excluded this evidence on the objection of contestants that it was not competent as rebuttal.

We think this evidence was competent in that character, and should have been received. The case in regard to the genuineness of the paper was very closely contested, and was one of the vital points in the trial. Evidence had been given on both sides and witnesses of the highest character and respectability had differed in regard to the genuineness of the signatures. Although the court, when the case was first with the proponents, had notified counsel that they must offer all the evidence they proposed to offer upon the subject before they first rested their case, and in accordance with such decision they had proceeded to give further evidence, we are not able to see how that fact is material at this point. Counsel for the proponents could not anticipate what evidence would be given by their opponents, nor what reasons might be offered by a witness as the ground for an opinion against the genuineness of any signature on the paper. When Mr. Randolph therefore was examined, and stated his opinion that the signature on the paper was not that of General Sherman, he was naturally asked on cross-examination if there were any particular reason why he had come to that conclusion, and in giving that reason he stated the failure of the lines to meet in the letter T, and the peculiarity of the loop in the letter S. The proponents could surely not be expected to anticipate that the letter T or the letter S would be the particular subject of criticism by any witness on the other side, nor what the character of the criticism might be. There was nothing to call their attention to the question, and in the nature of things it is plain the alleged peculiarities suggested by Mr. Randolph could not have been anticipated before they were spoken of by the witness. Under these circumstances it seems to us it was proper evidence in rebuttal, and that it was most important and material to show by a perfectly competent and absolutely disinterested witness, the son of General Sherman himself, that the peculiarities testified to by Mr. Randolph were in fact no peculiarities, and were frequently if not habitually present in the genuine signature. The fact that after the

witness Randolph had testified that he never saw one signature of General Sherman's in which the lines in the capital T did not meet, he subsequently stated that they met certainly as often as four out of five times, did not render the proposed evidence of Mr. Sherman immaterial when it was offered to be shown by him that these lines not only frequently but habitually met. It is possible to imagine that the signatures of General Sherman which Mr. Randolph had examined in the War Department would bear out his statement that the meeting of these lines occurred at least as often as in four out of five of the signatures, while in those examined by the son of the General, and with which he was familiar, a failure to meet might be frequent, if not habitual, and thus there might be no contradiction between the two witnesses; but such a case would be highly improbable to say the least, and we think that if Mr. Sherman had been permitted to testify upon the subject, and had in fact testified in accordance with the offer, such testimony would have been most material as affecting the reasons given by Mr. Randolph for his belief that the signature was not that of General Sherman. This might be true without impeaching in any degree the integrity of Mr. Randolph or his intention to testify what he believed to be the truth. As neither witness saw the signature made, it was a matter of opinion with each, and while either might have been mistaken, such mistake would not necessarily affect the character of the witness. It was not a case where the discretion of the judge was appealed to. It was a case of strict right, and we are of opinion that the court below erred in refusing to admit the evidence. In such a case as this, where there was no evidence by an eyewitness as to the signatures of the parties, it became of the greatest importance that no admissible evidence should be excluded when offered upon the question of their genuineness. For this error we think a new trial will have to be granted.

Again, in the course of the trial the contestants called a Mrs. Briggs as a witness, and proved by her that she was a journalist by profession and had made literature her business in life, and that she had received instruction from Judge Holt in the line of composition in the English language; that she had gone to him

and asked his advice about a series of articles written by her, because she had been informed that he was a master of the English language; that he was her master and teacher in such matters. She was also somewhat familiar with his handwriting, and stated that in her opinion the signature "J. Holt" to the paper in question was not the signature of Judge Holt. She was then asked: "Have you formed that opinion in any respect upon any matter except the mere handwriting?" This was objected to and admitted under an exception. The witness answered that she had, that it was from the composition: "More the composition, as well as the writing."

Other witnesses were called who were permitted to prove that they formed their opinions in regard to the paper from its composition and style, and their knowledge of Judge Holt's legal and literary attainments, as well as from their familiarity with his handwriting. One witness was asked this question: "Let me call your attention to the use of the word 'inherit' in that paper, in the middle paragraph. From your knowledge of General Holt's characteristics and his way of expressing himself, what do you think as to that being his expression?" This question was duly objected to and the grounds fully stated, but the court overruled the objection and permitted the witness to answer, which he did by saying that he did not think the testator would use that expression.

The counsel for the contestants say that these rulings were right, but that if there were any error, it was cured by the subsequent charge of the court to the jury, given upon the request of counsel for the contestants, in which the jury were instructed "to disregard any opinion as to whether Joseph Holt wrote the paper in controversy that may have been expressed by any of the witnesses for the caveators in this case so far as such opinion was based upon anything but the handwriting of the paper. In so far as any such opinion may have been based in whole or in part upon the composition of the paper or the expressions contained in it, or the legal or literary attainments of said Joseph Holt, they are withdrawn from the consideration of the jury. But all other evidence which has been admitted in this case bearing upon the legal attainments and literary style of said

Joseph Holt remains as competent evidence for the consideration of the jury, along with the other evidence in the case bearing upon the question of the genuineness of said paper."

The general rule is that if evidence which may have been taken in the course of a trial, be withdrawn from the consideration of the jury by the direction of the presiding judge, that such direction cures any error which may have been committed by its introduction. *Pennsylvania Coal Company* v. *Roy*, 102 U. S. 452; *Hopt* v. *Utah*, 120 U. S. 430, 438. But yet there may be instances where such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission, and in that case the general objection may avail on appeal or writ of error. This was stated by Mr. Justice Field in *Hopt* v. *Utah, supra.* And see *Waldron* v. *Waldron*, 156 U. S. 361, 383.

There may also be a defect in the language of the attempted withdrawal, whether it was sufficiently definite to clearly identify the portion to be withdrawn. This evidence was regarded upon the trial as of considerable importance. The question of its admissibility was raised in the early stages of the trial, and the evidence was excluded. It was again raised while the case was with the contestants and the evidence admitted at their instance, and several witnesses sworn in regard to it. After that an effort was made on the part of the proponents to give testimony in their favor on this question, and it was refused as not rebutting in its character. It is not a case therefore of the introduction of merely irrelevant evidence, such as was stated in *Pennsylvania Coal Company* v. *Roy, supra;* nor like the case of *Hopt* v. *Utah, supra,* where the testimony of a single witness, a physician, as to the direction from which the blow was delivered, had been admitted, and where it was held that if it had been erroneously admitted, its subsequent withdrawal from the case with the accompanying instructions cured the error. That was a plain question of evidence on a single point, and on the part of one witness only.

Here was a case where several witnesses gave opinions in regard to the handwriting in the disputed paper, based upon

their knowledge of the handwriting of Judge Holt, and also based upon their familiarity with his legal attainments and with his characteristics of style and composition, while others based their opinions upon handwriting only. Which were the witnesses that based their opinions partly upon both foundations, the jury could not be expected to accurately recall after a long trial lasting several weeks. Nevertheless it was called upon to separate and cast aside that portion of the evidence which had been based upon such facts, and after excluding that evidence, determine as to the value of the remaining opinions based upon knowledge of handwriting only. It is at least questionable whether the case does not come within the exception to the rule by reason of the possible impression produced upon the jury during the long trial, in which the evidence of several witnesses upon this point was given after much opposition and long argument as to its admissibility.

The witnesses who testified upon both knowledge of handwriting and familiarity with the style and legal attainments of Judge Holt may have made the deeper impression upon the jury, and they may have failed to realize that it was those particular witnesses whose evidence on the subject was to be withdrawn. And while the opinions of these witnesses as to the handwriting of the deceased were withdrawn, yet their evidence as to the legal attainments and composition and style of Judge Holt was to remain as competent evidence in the case. All this was called for by the directions, and without naming a single witness or recalling to the jury the fact that it was his particular opinion regarding the handwriting which was withdrawn. This was a somewhat difficult task for any mind, and there was no certainty under such general directions that it was properly understood, or that with the best intentions it was fully performed. In such a case as this and under the particular facts herein we think the names of the witnesses should have been given and the specific evidence which was given by them and which was to be withdrawn should have been pointed out.

The court, be it remembered, was not responsible for the character of the directions. It simply gave them as asked for by

the contestants and in the language prepared by their counsel, and whatever they lacked in the way of precision and certainty is not the fault of the court.

It would appear that the counsel felt the doubt as to the admissibility of the evidence, and after striving so hard to get it in, when they desired it to be withdrawn they were under an obligation to have it done plainly and certainly. Upon the particular facts of this case, while not impairing the force of the general rule, we are of opinion that the withdrawal was far too uncertain to be of any avail.

We are thus brought to a consideration of the merits of the question decided by the court below. Is the opinion of a witness as to the genuineness of the handwriting found in the paper, based in part upon the knowledge of the witness, of the character and style of composition and the legal and literary attainments of the individual whose handwriting it purports to be, competent to go to the jury upon that question? If he is able to give an opinion without such evidence, and from his familiarity alone with the handwriting, can the attempt be permitted to corroborate or strengthen such an opinion by this kind of evidence? We think not. An expert in regard to handwriting is one who has become familiar with the handwriting of the individual in regard to whom the question is raised. Handwriting is a physical matter and does not in itself represent any characteristics of the writer as to composition or general style, or as to his literary or legal attainments. It is to be seen and the characters recognized by the eye. But the process of his mind and the language or style in which in the opinion of a witness the person habitually clothes his thoughts, are not matter of expert evidence, proper to be presented to a jury, for the purpose of determining whether the paper presented is or is not in the handwriting of the particular individual, in regard to whom the inquiry is made. The fact may of course be proved that the person was a man of intelligence, education, high legal attainments, refinement, and not addicted to coarseness in speech or writing, and the inference may be sought to be drawn from the facts that the paper in question is or is not his composition and is or is not his handwriting; but where it is material the

inference is for the jury, and taking the opinion of the witness in that regard is to take his opinion upon the very subject to be decided by the jury, and is not at all a proper case for opinion evidence.

We think the court, therefore, erred in permitting witnesses to give an opinion as to the genuineness of handwriting founded partly upon knowledge and familiarity with the legal attainments, the style and composition of the individual whose handwriting was in controversy, and as corroborative of their opinion from knowledge of handwriting alone.

The two points above indicated in which we think the trial court fell into error require the reversal of this judgment, and the granting of a new trial, but there are other questions in the case which are fully presented by the record, and which have been most ably and exhaustively argued by counsel on both sides. These questions will necessarily arise at the very threshold of the case when it comes on for trial again, and we think it is our duty to express our views in relation to them. They relate to certain evidence upon the issues of forgery and revocation.

And first, as to forgery. The paper in question was propounded as the will of Joseph Holt.

The facts set forth in the statement prefixed to this opinion show the case to be one of an extraordinary nature. There being no proof in regard to the history or whereabouts of the paper before it was received by the register of wills, and the evidence *pro* and *con* as to its genuineness having been received upon the trial, the question arises as to the admissibility of the various declarations of the deceased, and also of his letters to different relatives living in Kentucky and other States, which it is claimed tend to show the improbability of the deceased making such a disposition of his property as is made in the paper in controversy. (They are referred to in the statement of facts above given.) The question is, in other words, can the contestants prove by unsworn oral declarations and by letters of the deceased facts from which an inference is sought to be drawn that the disposition of the property as made in the paper is improbable, and that the paper was therefore a forgery?

The decisions of the state courts as to the admissibility of this kind of evidence are not in accord. Many of them are cited in the margin.[1] Those included in class A favor the exclusion of such evidence, while those in class B favor its admission. The principle of exclusion was favored by Chancellor Kent, and also by Justices Washington, Story, Livingston and Thompson, all of whom once occupied seats upon the bench of this court.

The cases cited in the two classes do not all, or even a majority of them, deal with the question of forgery, but many of them treat the subject of declarations of a deceased person upon a principle which would admit or exclude them in a case where forgery was the issue. It is not possible to comment upon each of the cases cited in these lists, without unduly extending this opinion. We can only refer to the two classes generally, and state what we think are the questions decided by them.

[1] Class A. *Boylan* ads. *Meeker*, 28 N. J. Law, 274; *Rusling* v. *Rusling*, 36 N. J. Eq. 603; *Gordon's Case*, 50 N. J. Eq. 397, 424; *Hayes* v. *West*, 37 Ind. 21; *Kennedy* v. *Upshaw*, 64 Texas, 411; *Mooney* v. *Olsen*, 22 Kan. 69; *Thompson* v. *Updegraff*, 3 W. Va. 629; *Couch* v. *Eastham*, 27 W. Va. 796; *Dinges* v. *Branson*, 14 W. Va. 100; *Gibson* v. *Gibson*, 24 Mo. 227; *Cawthorn* v. *Haynes*, Id. 236; *Walton* v. *Kendrick*, 122 Mo. 504; *Comstock* v. *Hadlyme*, 8 Conn. 254, 263; *Shailer* v. *Bumstead*, 99 Mass. 112; *Lane* v. *Moore*, 151 Mass. 87; *Robinson* v. *Hutchinson*, 27 Vt. 38, where the evidence was received, but the inquiry was as to mental capacity, the testatrix being greatly broken and enfeebled in mind and capacity and of advanced age; *Jackson* v. *Kniffen*, 2 Johns. 31; *Jackson* v. *Betts*, 6 Cow. 377; *Waterman* v. *Whitney*, 11 N. Y. (1 Kernan) 157, citing many cases; *Johnson* v. *Hicks*, 1 Lansing (N. Y.), 150; *Marx* v. *McGlynn*, 88 N. Y. 357; *Leslie* v. *McMurtry*, 60 Ark. 301; *Stevens* v. *Vancleve*, 4 Wash. C. C. 262; *Provis* v. *Reed*, 5 Bing. 435; 1 Redfield on Wills (4th ed.), pp. 556, 557; Gillett on Ev. sec. 281; Schouler on Wills (3d ed.), sec. 317a.

Class B. *Turner* v. *Hand*, 3 Wall. Jr. 88, 92, 107; *Warren* v. *Brown*, 51 Tex. 65; *Swope* v. *Donnelly*, 190 Pa. St. 417; *Taylor Will Case*, decided by Surrogate of New York County, 10 Abb. Pr. N. S. 300, 306. This case was reversed *sub nom. Howland* v. *Taylor*, in the Court of Appeals on a question of fact, but no opinion is reported: 53 N. Y. 627; *Davis* v. *Elliott*, 55 N. J. Eq. 473; claimed by respondents to be adverse to *Boylan* ads. *Meeker*, which is not referred to neither is the question itself discussed, although evidence of this nature seems to have been received, without objection; *Hoppe* v. *Byers*, 60 Md. 381; *Burge* v. *Hamilton*, 72 Ga. 568, 624; *Sugden* v. *Lord St. Leonards*, L. R. 1 P. D. 154; *Collagan* v. *Harrison*, 57 Me. 449, by an equally divided court; 1 Phillim. Rep. 447–460.

In the cases contained in class A, it is held that declarations, either oral or written, made by a testator, either before or after the date of the alleged will, unless made near enough to the time of its execution to become a part of the *res gestæ*, are not admissible as evidence in favor of or against the validity of the will. The exception to the rule as admitted by these cases is that where the issue involves the testamentary capacity of the testator and also when questions of undue influence over a weakened mind are the subject of inquiry, declarations of the testator made before or after, and yet so near to the time of the execution of the will as to permit of the inference that the same state of mind existed when the will was made, are admissible for the purpose of supporting or disproving the mental capacity of the testator to make a will at the time of the execution of the instrument propounded as such. These declarations are to be admitted, not in any manner as proof of the truth of the statements declared, but only for the purpose of showing thereby what in fact was the mental condition, or, in other words, the mental capacity, of the testator at the time when the instrument in question was executed.

The cases contained in class B favor generally the admission of declarations of the deceased, made under similar conditions in which declarations are excluded by the cases in class A.

If declarations of the character now under consideration are admissible when made prior to the execution of the alleged will, although not after it, then a large part of the evidence in this case as to the oral and written declarations of the deceased was properly admitted upon the issue of forgery, because such declarations may have all been made before the forgery was executed, the date of the paper not furnishing any evidence of the time when it was in fact prepared. The forger could not be permitted, by giving a date to the instrument, to fix the time subsequent to which the declarations should be excluded.

But we see no good ground for the distinction. The reasons for excluding them after the date of the will are just as potent when they were made prior thereto. When made prior to the will, it is said they indicate an intention as to a testamentary disposition of property thereafter to be made, and that such

declarations may be corroborative of the other testimony as to what is contained in the will, as is said by Mellish, L. J., in *Sugden* v. *Lord St. Leonards*, L. R. 1 P. D. 154, 251, (a case of a lost will,) or else they indicate the feeling of the deceased towards his relatives, from which an inference is sought that a. testamentary provision not in accordance with such declarations would be forged. The declarations are, however, unsworn in either case, and if they are inadmissible on that ground when made subsequent to the execution of the will, they would be also inadmissible when made prior to its execution. In *Stevens* v. *Vancleve*, 4 Washington C. C. 262, 265, *supra*, Mr. Justice Washington said that declarations of the deceased, prior or subsequent to the execution of the will, were nothing more than hearsay, and there was nothing more dangerous than their admission, either to control the construction of the instrument or to support or destroy its validity. Judge Pennington concurred in those views.

After much reflection upon the subject, we are inclined to the opinion that not only is the weight of authority with the cases which exclude the evidence both before and after the execution, but the principles upon which our law of evidence is founded necessitate that exclusion. The declarations are purely hearsay, being merely unsworn declarations, and when no part of the *res gestæ* are not within any of the recognized exceptions admitting evidence of that kind. Although in some of the cases the remark is made that declarations are admissible which tend to show the state of the affections of the deceased as a mental *condition*, yet they are generally stated in cases where the mental *capacity* of the deceased is the subject of the inquiry, and in those cases his declarations on that subject are just as likely to aid in answering the question as to mental capacity as those upon any other subject. But if the matter in issue be not the mental capacity of the deceased, then such unsworn declarations, as indicative of the state of his affections, are no more admissible than would be his unsworn declarations as to any other fact.

When they are not a part of the *res gestæ*, declarations of this nature are excluded because they are unsworn, being hearsay only, and where they are claimed to be admissible on the ground

that they are said to indicate the condition of mind of the deceased with regard to his affections, they are still unsworn declarations, and they cannot be admitted if other unsworn declarations are excluded. In other words, there is no ground for an exception in favor of the admissibility of declarations of a deceased person as to the state of his affections, when the mental or testamentary capacity of the deceased is not in issue. When such an issue is made, it is one which relates to a state of mind which was involuntary and over which the deceased had not the control of the sane individual, and his declarations are admitted, not as any evidence of their truth, but only because he made them, and that is an original fact from which, among others, light is sought to be reflected upon the main issue of testamentary capacity. The truth or falsity of such declarations is not important upon such an issue, (unless that for the purpose of showing delusion it may be necessary to give evidence of their falsity,) but the mere fact that they were uttered may be most material evidence upon that issue. The declarations of the sane man are under his control, and they may or may not reflect his true feelings, while the utterances of the man whose mind is impaired from disease or old age are not the result of reflection and judgment, but spontaneous outpourings arising from mental weakness or derangement. The difference between the two, both as to the manner and subject of the declarations, might be obvious. It is quite apparent therefore that declarations of the deceased are properly received upon the question of his state of mind, whether mentally strong and capable or weak and incapable, and that from all the testimony, including his declarations, his mental capacity can probably be determined with considerable accuracy. Whether the utterances are true or false cannot be determined from their mere statement, and they are without value as proof of their truth, whether made by the sane or insane, because they are in either case unsworn declarations.

Thus it is said in *Shailer* v. *Bumstead*, 99 Mass. 112, which is one of the cases cited in the margin in class A : " Intention, purpose, mental peculiarity and condition are mainly ascertainable through the medium afforded by the power of language.

Statements and declarations, when the state of the mind is the fact to be shown, are therefore received as mental acts or conduct. *The truth or falsity of the statement is of no consequence.*" The testatrix in the above case died in 1865, at the age of ninety-one, having executed a will in 1851, another in 1853, and a codicil thereto in 1857, and among other issues raised was one of testamentary capacity. The declarations that were held admissible were only for the purpose of showing " what manner of person she was," who uttered them. They were used to throw light upon an alleged state of mind which was involuntary and the result of disease and old age. If used for any other purpose they were not admissible, said the court, because they were mere hearsay and could never be explained or contradicted by the person who uttered them.

And so in *Gibson* v. *Gibson*, 24 Missouri, 227, the court said such declarations were admitted when it was proposed to show the condition of the testator's mind or to show the state of his affections, but never as a mere narrative of facts. The latter remark is explained in the next case in the same volume, (p. 236,) the opinion in which was delivered by the same judge, by which it is seen that such evidence was admissible only on the issue of insanity. See pages 238 and 239, where the point is plainly made that there must be a foundation of that kind in order to let in the proof of declarations as to his affections, which could only be admitted on such an issue.

And it was also said in *Waterman* v. *Whitney*, 11 N. Y. *supra*, that to receive declarations when no such issue was involved would be attended " with all the dangers which could grow out of a change of purpose, or of external motives operating upon an intelligent mind. No such dangers would attend the evidence upon inquiries in relation to the sanity or capacity of the testator." To the same effect is *Boylan* ads. *Meeker*, 28 N. J. L. cited in class A. It is therefore clear that as their truth in such an issue is not of importance, and their materiality lies only in the fact that they were made, the principle of rejecting unsworn declarations has no application. But when it is sought to prove them as coming from one about whose perfect mental capacity there is no dispute, although

they relate to the alleged state of his affections when made, the only possible importance of such declarations rests in the claim that they are true, and an inference is sought to be drawn which is founded wholly upon the assumption of their truth. Now if their only value rest upon that assumption, then the fact that they are unsworn declarations brings them at once within the bar of the general rule of evidence that unsworn declarations are not admissible. As indicative of mental capacity they are original evidence, sworn to by the witness, but as evidence of the truth of the statement declared they are simply unsworn declarations, and should be excluded accordingly.

The cases mentioned in class B proceed upon a totally different theory, viz., that the declarations may be true and are made by a person who knows all about the subject, and they are therefore proper to be submitted to the jury for what that body may regard their worth, although it is admitted that it is a very dangerous kind of evidence. We are familiar with the case of *Sugden* v. *Lord St. Leonards, supra,* L. R. 1 P. D. 154. Cockburn, Chief Justice, in that case favored the admission of declarations of the testator as secondary evidence of the contents of the lost will, on the ground that such declarations were usually honestly made, and that the evidence might be put on the same footing with declarations of a family in matters of pedigree, evidence not always to be relied on, yet sufficiently so to make it worth admitting, leaving its effect to be judged of by those who have to decide the case. pp. 224, 225. It seems to us that the admission of the evidence substantially enlarged the exception to the rule as to hearsay. Jessel, M. R., (at p. 240), undertook to give the exceptions to the general rule as to hearsay, (which exceptions do not include this case,) but he thought upon the principles upon which some of the exceptions were founded, the declarations had been properly admitted, the case being one of a lost will, known to have existed but which at the death of the testator was not forthcoming. Mellish, L. J., thought the declarations of testator made after the will were inadmissible, while James, L. J., and Baggallay, J. A., concurred with the Chief Justice.

The remarks of the Master of the Rolls were adverted to in

the subsequent case of *Woodward* v. *Goulstone*, in the House of Lords, L. R. 11 App. C. 469, by Herschell, L. C., and by Lords Blackburn and Fitzgerald, all of whom stated (pp. 478, 484, 486) that they did not wish in deciding the case to be regarded as approving the views in the *Sugden* case upon the admissibility of the declarations of the deceased testator made subsequently to the execution of the will, even in the case of a lost will; that the question was not necessary to the decision of the case then before them, and that they wished to reserve their opinion until it was necessary to decide it. Considerable doubt is thus thrown by the highest legal tribunal in England upon the correctness of the decision of the lower court. In New York and probably in most of the other States the character and sufficiency of the evidence to establish a lost will are provided for by statute. *Schultz* v. *Schultz*, 35 N. Y. 653.

The decision in the *Sugden* case also overrules that of *Quick* v. *Quick*, 3 Sw. & Tr. 442, where Lord Penzance refused probate of the alleged will, there being no other evidence of its contents than the declarations of the testator made after its execution, and it also runs counter to the opinion of Lord Campbell in *Doe* v. *Palmer*, 16 Q. B. 747.

The law cannot therefore be regarded as settled in England that, even in the case of a lost will, declarations of the testator made after its execution are to be admitted as evidence of its contents. It is also proper to call attention to the fact that all the judges participating in the decision of *Sugden's* case were entirely satisfied with the proof of the contents of the lost will, wholly aside from evidence of these declarations.

While the case is not like the one before us, inasmuch as the inquiry here is not in regard to the contents of a lost will, yet it might perhaps be urged with some force that if declarations of that kind were admissible, the evidence now before us is competent, and was properly admitted.

We are, however, convinced that the true rule excludes evidence of the kind we are considering. We remain of the opinion that the declarations come within no exception to the law excluding hearsay evidence upon the trial of an action, and we think the exceptions should not be enlarged to admit the evi-

dence. Where the issue is not one in regard to the mental capacity of the alleged testator to make a will, his declarations upon the subject cannot be said to be declarations made against interest, such as declarations made by an individual while in possession of property, in disparagement of his absolute ownership. Such evidence has been admitted as declarations against interest or as characterizing possession, but the same declarations made after a conveyance of the land would be inadmissible, as mere hearsay and in no degree as declarations against interest. Declarations made by an alleged testator before or after the date of the paper are not declarations against interest, because they can have no effect upon his interest. The will would not take effect until after his death, and before that time he could revoke it or make another, and it would still be immaterial evidence even if he did neither.

There is another reason why no exception should be made in favor of such evidence upon which to build a presumption or inference of forgery, and that is the inherent weakness and danger of the evidence itself. No inference is generally more uncertain or unreliable than that which is sought to be drawn upon the question of the genuineness of a will from the alleged condition of a testator's mind towards relatives or others, as evidenced by his declarations. It is every day experience that declarations of that nature are to the last degree unreliable as a basis for an inference as to probable testamentary disposition of property. Those who thought by reason of such declarations that they would certainly be remembered in the will of the testator are so frequently disappointed, and that too in cases where there is not the remotest suspicion of forgery, that it would seem exceedingly unsafe to permit a jury to draw an inference based upon such evidence, relative to the genuine character of the instrument propounded as a will. Although admitting the evidence, yet Sir John Nicholl, in *Johnston* v. *Johnston*, 1 Phillim. Rep. 447, 460, said : " Parol declarations ought to be received with great caution ; in general, they are the lowest species of evidence. . . . They may on the part of the testator be insincere, or at best the mere passing thought of the moment, and are liable on the part of witnesses to be misappre-

hended and misrepresented.   But confidential communications with his wife upon her serious representations to him respecting so important a subject are deserving of rather more weight as evidence of the deceased's mind and intentions."

The common-law rules of evidence do not obtain in the ecclesiastical courts of England in regard to the proof of wills relating to personalty.   " On the contrary, the evidence bearing on these points is generally mixed up with declarations of the party, and frequently consists of such declarations alone."   Per Tindal, Ch. J., in Exchequer Chamber, 1838, in *Marston* v. *Fox,* 8 Ad. & El. 14, 56.   The unreliable character of the evidence is acknowledged, but it is taken in connection with almost any other evidence, for what it is worth.   In our judgment its value is entirely too problematical at its best to cause us to make an exception to the well considered rule of evidence prohibiting hearsay.

The motives underlying and causing the particular provisions of a will may be so various and so hidden from observation that it is in the highest degree unsafe to draw an inference of forgery based upon declarations as to testamentary intentions which are so subject to change and which declarations may or may not represent the true feelings of the testator or even his actual testamentary intention at the time when spoken.   The result is very apt to be a breaking down of the safeguards provided by statute for the proof of the due execution of a will, and to provide in place of that proof evidence which is in itself of the most unsatisfactory nature, and from such evidence permit a jury to draw a still more uncertain inference of forgery.

We are not aware of any well founded rule permitting such evidence on the mere ground that it is probable the declarations were true, and therefore, though unsworn, should be received.   On this ground it might equally be maintained that evidence of the declarations of a person, since deceased, in a matter regarding which he had been familiar, who had been a man of undoubted character and probity, and who had had no interest in the subject, ought to be received though not sworn to.   But in such case the probability of their truth has not been regarded as sufficient to admit the declarations.

In matters of pedigree, declarations by members of the family are admitted, because the question in such cases is generally one concerning the parentage or descent of the individual, and in order to ascertain that fact it is material to know how he was acknowledged and treated by those who were interested in him or sustained towards him any relations of blood or affinity. 1 Greenleaf's Ev. secs. 103, 104. Evidence showing how he was acknowledged · and treated is frequently only to be shown by declarations made at the time, and though unsworn are received as the best that the nature of the case permits. The analogy between such evidence and evidence of the nature under discussion is somewhat formal and far-fetched.

Undoubtedly cases may arise from the enforcement of this rule where injustice may be the result. It is possible that a forged instrument may in a particular case be declared a true one, where if evidence of this nature had been admitted the decision might have been the other way. An extreme case may be assumed, such as was put by Mr. Justice Grier in *Turner* v. *Hand*, 3 Wall. Jr. 88, 107, *supra*, by way of illustration in charging the jury, and although he held in the case he was trying that the evidence was admissible, he at the same time said it must be regarded with very great caution as a dangerous kind of evidence. *Turner* v. *Hand* was one of the many phases in which the controversy over the alleged will of Meeker was conducted in the courts of New Jersey and in the Federal court, while *Boylan* ads. *Meeker*, 28 N. J. Law, above cited, was another.

The difficulty in regard to a rule of evidence is that it cannot be the subject of enforcement or non-enforcement according to the exigencies of the particular case. The rule must be general in its application. It cannot depend upon the opinion of the judge in each case whether the declarations are or are not to be relied upon. The rule must either permit or refuse to permit the evidence. We think that more injustice is possible as a result of admitting the evidence than from its exclusion. The statutes of all the States have very careful and stringent provisions in relation to the making of wills, and the due proof of their execution. The wills must be in writing, (with the

exception of certain nuncupative wills,) signed by the testator and witnessed by others; and to permit evidence of the nature given in this case tends, as we think, most strongly to break down the efficiency of the statutory provisions, and to render proof of the execution of wills much less certain than was contemplated by the statutes. If declarations of the deceased were admissible to attack, they would then of course be admissible to sustain the will, and there would be apt to arise a contest in regard to the number and character of conflicting declarations of the deceased which he could neither deny nor explain, and in the course of which contest great opportunities for fraud and perjury would exist. The statutes as to wills were passed, as we believe, for the very purpose of shutting out all contests of such a character.

If not admissible generally, it is as we think inadmissible even as merely corroborative of the evidence denying the genuine character of the handwriting. It is open to the same objection in either case as merely unsworn declarations or hearsay.

We are therefore of opinion that the court below erred in admitting this evidence upon the issue of forgery, and that the error was of a most important and material nature.

The last question is whether this evidence, even though not admissible on the issue of forgery, was admissible upon that of revocation, as it was offered on both, and if admissible upon either, the general objection to its admission would be unavailing, and there was no request to charge the jury to confine it to the issue of revocation alone. This question remains therefore, although the jury found there was no revocation because the will was never executed.

It is manifest that upon the issue of revocation the fact of the execution of the will is to be assumed, for in the nature of things one cannot revoke a will which he never made. It is conceded on the part of proponents that the will appeared, when it came to the hands of the register of wills, to have been mutilated, torn and burned around its edges, and counsel concede · that its appearance is such that if it had been found among the papers or repositories of the deceased, a presumption would have

arisen in favor of its revocation. The question is whether any presumption of cancellation or revocation by the deceased, or under his direction, is created in this case by the condition in which the paper was when received by the register of wills through the mail on August 26, 1895. If not, then these declarations subsequent to 1873 are not admissible on the theory that they are in aid or corroborative of a presumption that does not exist.

After proof that a will had been duly executed and was in the possession of the testator, the failure to find it after his death would be presumptive evidence that the testator had destroyed with an intention to revoke it. The presumption could, of course, be overcome by proper evidence leading to a contrary conclusion. This is conceded.

But here the will is found, not among the papers of the deceased at his former residence, but it comes through the mail to the register of wills more than a year after the decease of Judge Holt. The presumption of revocation cannot therefore attach from the failure to find a will once shown to have existed, for here the will is found and produced. We are left absolutely without evidence as to its whereabouts from the time of its execution in 1873 down to the time when the register of wills received the envelope enclosing it in August, 1895.

It is in evidence that immediately after the death of Judge Holt two of his nephews came to the house, and during the next few days papers were burned under their direction by one of the servants in the house. The evidence of these nephews given on the trial was absolute and distinct to the point that no paper of any consequence or in the nature of a testamentary disposition of property was found or destroyed, and there is no one to contradict or dispute such evidence; but the fact exists that there was a burning of papers.

Some evidence was given upon the subject of a similarity of form between the half printed and half written characters on the envelope directed to the register of wills and those found upon a sign put upon the stable of the deceased by the servant who had destroyed papers under the direction of the nephews, but we think such evidence was of no importance, and it must

therefore be admitted that there is no evidence that the address on the envelope was in the handwriting of any particular person.

We think no presumption of revocation by the testator, or under his direction, arises from the appearance of this will when first received by the register of wills:

In *Hitchings* v. *Wood and others*, decided by the Judicial Committee of the Privy Council in 1841, (2 Moore's P. C. C. 355, 447,) Lord Lyndhurst, Langdale, M. R., Shadwell, V. C. Baron Parke and Mr. Justice Littledale being in the court, the holograph instrument purporting to be a codicil to the will of James Wood, sent anonymously by the post to one of the legatees named therein, though partly burned and torn, was (reversing the court below) admitted to probate, the handwriting being satisfactorily proved; and it was held that under the circumstances of the case the *onus* of proving that the cancellation was the act of the testator, and with what intention it was done, lay on the parties opposing the proof. In the course of his opinion, Lord Lyndhurst said :

" Then, as to the alleged cancellation, we think, if this be a genuine instrument, that the *onus* to make out the fact of the cancellation is on those who oppose the codicil. It seems that a corner had been burnt, the paper torn through, and in one place across the signature; but by whom, and under what circumstances, does not appear. There is nothing whatever to show that it was done by the testator, or if so, with what intention it was done. If it be a genuine instrument it proves that there was also another codicil, and which is not forthcoming. It is obvious, we think, that it must have been improperly dealt with, for if it was defaced by the testator he would either have entirely destroyed it or it would have been found in this state among his papers. The circumstance of its being in other hands shows that a fraud had been practised, and that no safe conclusion can be drawn from its appearance that it was burnt or torn by the testator. But even if it had been found among the testator's papers at the time of his death, we incline to think some further evidence beyond its present appearance would be necessary to show that he intended to cancel it. Our opinion, therefore, is that the codicil ought to be approved."

OCTOBER TERM, 1900.

This case establishes the point that no presumption of revocation arose upon the facts herein by reason of the appearance of the paper, and after execution is proved by evidence of the handwriting the *onus* rests upon the individual claiming that the paper was revoked by the testator, to prove the fact. There must be some evidence of an act by the deceased, or under his direction, which would be sufficient to show the fact, or the instrument must have been found among the papers of the deceased, mutilated and torn or otherwise defaced, and under such circumstances that the fact of revocation might be presumed. It was observed in *Johnston* v. *Johnston*, 1 Phillimore Rep. 447, 497, that a will once regularly made, the presumption of law is strong in its favor; the intention to revoke must be plain and without doubt.

There being no presumption of revocation from the appearance of the paper, and the *onus* being on those who assert its revocation, can the written or oral declarations of the testator, made subsequently to the execution of the will, and tending to show the existence of another will, not otherwise proved, or tending to show the state of his affections for his relatives and an alleged change in his feelings towards the relatives of one of the legatees, though not toward the legatee herself, be admitted for the purpose of asking the jury to infer either that the testator himself mutilated and burned with the intention to revoke the will, or directed the acts of mutilation and burning, in order to accomplish such revocation? Can such evidence take the place of proof of an act on the part of the deceased (or directed by him) sufficient to revoke a will, and from which an intention to revoke might be presumed? Here is simply a case of an inference sought to be drawn that the testator did the act and with the intent to revoke the will, because of his making certain declarations as to a will and also because he had expressed friendly feelings towards some of his relatives, and feelings the reverse of friendly towards the father of one of the legatees.

The will having been executed by the testator, it is said that it must be assumed to have been in his possession or under his control up to the time of his decease, and it is urged that proof

of the state of mind of the testator during more than twenty years subsequent to the execution of the will is proper to be considered by the jury, in order that it may from that proof infer that the acts of mutilation were performed by the testator or under his direction, and also that they were performed or directed with the purpose of revocation. A double inference is thus based upon a most insecure and dangerous foundation. The evidence is of the same nature that we have just said was inadmissible upon the issue of forgery; only here the inference sought is a revocation instead of the forgery of the will. We think the declarations are no more admissible for the purpose of inferring a revocation than for the purpose of inferring the forgery of the will.

There is in the first place no evidence that the testator either himself performed or that he authorized the acts of mutilation, and we think no presumption that he did can arise from the fact that the will was not found among his papers. And the appearance of the will when received by the register furnished no such presumption.

Counsel for the contestants have cited a number of cases which they claim show the admissibility of this class of evidence, in addition to those cited in the foregoing discussion, upon the issue of forgery. They are placed in the margin.[1]

The evidence is claimed to be admissible for the purpose of authorizing an inference therefrom that the testator himself mutilated or directed the mutilation of the will for the purpose of thereby revoking it. Declarations made by a testator at the time of mutilation or cancellation, going to show the intent with which the act is done, are of course admissible, being part of the *res gestæ.* But as the production of the will under the circumstances proved in this case created no presumption of revocation, it was necessary to prove that the act of mutilation

---

[1] *Lawyer* v. *Smith*, 8 Mich. 411, 423; *Patterson* v. *Hickey*, 32 Ga. 156, 164; *Harring* v. *Allen*, 25 Mich. 505; *Burge* v. *Hamilton*, 72 Ga. 568, 625; *Collagan* v. *Burns*, 57 Me. 449; *Collyer* v. *Collyer*, 110 N. Y. 481, 484; *McDonald* v. *McDonald*, 142 Ind. 55, 81; *Miller* v. *Phillips*, 9 R. I. 141, 144; *In re Valentine's Will*, 93 Wis. 45, 55; *Pickens* v. *Davis*, 134 Mass. 252; *Gould* v. *Lakes*, L. R. 6 P. D. 1, 5.

was performed by the testator or by his direction, and with an intention to revoke, and we think that his declarations, not being part of the *res gestæ*, cannot be permitted for the purpose of asking the jury to infer therefrom that the testator not only performed or directed the act of mutilation but did so with the intent to revoke the instrument. This kind of evidence is of a most dangerous character. It is hearsay, and nothing more.

Some of the cases cited above admitted proof of declarations in aid of the presumption of revocation arising from the finding of the mutilated will among the effects of the deceased. *Lawyer* v. *Smith*, 8 Mich. 411; *Patterson* v. *Hickey*, 32 Georgia, 156. Another case, *Burge* v. *Hamilton*, 72 Georgia, 568, admitted declarations of a testator made to his attorney at the time of the execution of a codicil to his will, in relation to the number of pages to his will, then present and exhibited to the attorney, the question arising from some mistake in the numbering of the pages, and the testator declaring to his attorney that the will which was then read over to him was all right and the numbering of the pages a mistake. The court held the paper presented an ambiguity, and a question of the identity of the paper produced with the will as executed. The declarations were in reality part of the *res gestæ*.

In another case the evidence went to prove that two sheets stitched together and found in an envelope were parts of the will. *Gould* v. *Lakes*, L. R. 6 P. D. 1. In some of the other cases declarations were admitted on the same theory as stated above in the discussion as to forgery.

There must be an act and an intention in order to revoke. Neither can be inferred from evidence of declarations of a testator apart from the act, and with no proof that the testator ever performed an act of a revocatory nature. Unless a part of the *res gestæ* we see no reason for the admission of these declarations any more than, upon the issue of forgery.

As is stated by James, Lord Justice, in *Cheese* v. *Lovejoy*, L. R. 2 P. D. 251, in speaking of the evidence of revocation:

"It is quite clear that a symbolical burning will not do, a symbolical tearing will not do, nor will a symbolical destruction. There must be the act as well as the intention. As it was put

by Dr. Deane in the court below, 'all the destroying in the world without intention will not revoke a will, nor all the intention in the world without destroying; there must be the two.'"

We cannot overcome the feeling that to admit evidence of this nature is in the highest degree dangerous, and that its admission would tend very strongly to impair the efficacy of the statutes relating to the proof and revocation of wills.

> *The judgment of the Court of Appeals of the District of Columbia is reversed and the cause remanded to that court with directions to reverse the judgment of the Supreme Court of the District and to remand the cause to that court with instructions to grant a new trial.*

MR. JUSTICE HARLAN, MR. JUSTICE WHITE and MR. JUSTICE McKENNA agreed with the opinion only upon the first and second grounds discussed, and dissented from the others.

MR. JUSTICE BROWN concurred in the result.