KULTZ v. JAEGER.

------

WILLS; UNDUE INFLUENCE; HUSBAND AND WIFE; PRESUMPTIONS; EVIDENCE; DECLARATIONS AS EVIDENCE; ANIMO TESTANDI.

1. The will of a person of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence.

2. There is no presumption of law that a devise by a wife of all of her estate to her husband is fraudulent; nor is it suggestive of undue influence.

3. Upon the review of the testimony in a contest involving the validity of a will by which the testatrix left her entire estate to her husband, showing repeated quarrels between the couple, and instances of ill treatment of the wife by the husband for some years prior to the making of the will, but not negativing forgiveness by her; and also showing anxiety on his part that she should make such a will, and that he went for the person who prepared it and for another who witnessed it, but not showing that he urged his wife to make it, or that she yielded to any importunity on his part, or that he was present when it was executed,—the action of the trial court in directing a verdict for the caveatees on the issue of undue influence, it having been conceded

that the testatrix was of sound mind, was *held* not to be error, on the ground that the evidence did no more than to raise a suspicion of undue influence.

4. Where the disputed issue in a will contest is as to whether undue influence was exercised on the testatrix, evidence of her declarations, both before and after the execution of the will, as to her testamentary intentions and concerning her relations with the beneficiary under the will and her next of kin, are inadmissible, when not a part of the *res gestæ.*

5. Evidence of quarrels between husband and wife five and eight years before the execution of a will by her leaving her entire estate to him are inadmissible in a proceeding by her heirs and next of kin, attacking validity of the will, where there is also evidence that such quarrels were followed by long intervals during which they lived together amicably.

6. Testimony by a witness in a will contest, in which the husband of the testatrix is charged with the exercise of undue influence upon her, is properly rejected when to the effect that three and a half years before the will was made he saw the testatrix in tears, and in his opinion her manner towards her husband was that of a woman who was cowed and intimidated, and that she was very humble before him, as such an opinion is inadmissible.

7. A paper which is not operative as a will disposing of property may yet be good as a testamentary appointment of an executor; and such a paper may be admitted to probate, if, looking at the entire paper, it is clear it was executed *animo testandi.*

8. Whether devises and bequests, or any of them, made by a paper writing purporting to be a will, are invalid or in any way ineffective, will not be determined in a proceeding attacking the validity of the paper as a will on the grounds of want of testamentary capacity on the part of the person making it, and the exercise upon him of undue influence.

9. Failure to fill in blanks left for the names of the residuary legatees or devisees will not invalidate a will, where otherwise it is a complete and finished paper, executed and published *animo testandi.*

No. 1735.   Submitted February 5, 1907.   Decided April 5, 1907.

HEARING on an appeal by the caveators from a judgment of the Supreme Court of the District of Columbia sitting as a probate court, admitting a will to probate after the trial of issues before a jury to determine its validity.   *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from an order admitting to probate a paper writing claimed to be the last will and testament of Hannah Jaeger, deceased, the paper being dated April 21, 1904, and attested by two witnesses. To the contents of the paper thus attested we later refer. Under the direction of the court upon the three issues submitted to it, the jury returned their verdict that Hannah Jaeger, at the time of the execution of the alleged will, was of sound and disposing mind and capable of executing a valid deed or contract, and that this paper writing was not secured by the undue influence of Frank Jaeger or any other person, and that it was the last will and testament of Hannah Jaeger, deceased. The court passed an order making Frank Jaeger, the caveatee, plaintiff, and Christina Kultz and Christina McGuigan, caveators, defendants; and at the trial the caveatee, as plaintiff, proved by Woodward and Boyer that the testatrix, Hannah Jaeger, executed this will on April 21, 1904. Boyer, a notary public, had written the will. The record fails to show the circumstances attending the execution of this paper. The brief of appellants' counsel states the circumstances of the execution of the paper and the value of the estate, which would be material if contained in the record. It appears that the jury and the trial judge had the benefit of information which we do not possess.

On behalf of the caveators, Doctor Tiefenthaler testified that he attended Mrs. Jaeger about Tuesday, April 19, 1904, and on the following day he examined her and advised her to go to the hospital, whither she went on Friday or Saturday following. She was suffering from a pelvic abscess, causing acute pain in her side, from hemorrhages and fever. Her condition was serious; she was physically weak, with a temperature of one hundred and one or two degrees, and an operation was necessary. The Doctor said that the disease from which she suffered did not necessarily derange her mentally, and that her weakness was not so great that she was not probably mentally all right, and he noticed nothing mentally wrong about her. Five days after

going to the hospital she underwent an operation, and died thereafter, on the same day. The court below admitted evidence showing that on November 14, 1903, Frank Jaeger, the husband of Hannah, was convicted of an assault upon his wife. Carl Jaeger, a brother of the caveatee, testified that Frank and Hannah Jaeger had been married about nine years, and that they had frequent quarrels; that once Frank broke up all the dishes and chased her out of the house. These quarrels occurred about two years and one year before her death. The witness was not permitted to repeat what Hannah Jaeger said to him tending to show that she was afraid of her husband, nor to repeat declarations made by her long before and just prior to her death, that she would not leave her husband one dollar. The court thereupon ruled that it would exclude from the jury all declarations of the deceased except such as were made at the time of the making of the will and such as were properly a part of the *res gestæ;* also all declarations of the deceased that she was afraid of the plaintiff, or tending to show her estrangement from him, and also all of her declarations concerning her intentions toward the caveatee or the caveators. Carl Jaeger, continuing, testified that on the day the will was made, in the afternoon, his brother and he were walking down the street, and his brother told him that he was going to see Mr. Boyer to get him to draw the will, and the same evening Frank told him, "I am all right now, I have got it fixed up now. The old woman (meaning Mrs. Kultz, his wife's mother) can fight all she pleases." His brother added, "Don't you say anything to anybody." The witness said that the business conducted by the pair had belonged to Hannah Jaeger before she married Frank; that his brother was a baker and this was an umbrella business, and that the assault arose from a difference about the business; that his brother Frank wanted it conducted in his name and wanted the money proceeds in his name, and that Hannah refused to consent. Her money was in the Perpetual Building Association, in her own name. The witness said that Frank and Hannah lived with the witness on 11th Street about eight years ago. He further testified that Frank Jaeger owned a house at the time of

the marriage, and that Hannah Jaeger paid off a mortgage thereon of about $700. Hannah Jaeger had conveyed all her property to Gustave Lalor, who afterwards conveyed it to Frank and Hannah Jaeger, jointly; and Frank Jaeger had told Carl that Hannah had conveyed the property to him for the sake of peace. Michael Newmyer, who lived next door to them for years, testified that he had heard Frank and Hannah frequently quarreling, and that the quarrels continued up to the time of her last sickness.

On the day the will was made, Frank had said he had not taken his wife to the hospital, as the doctor directed, because he did not have the will made and he could not get Mr. Boyer. He wanted the will made first, because after Hannah was out of the house Mrs. Kultz would go to the hospital and try to force a will on her.

Christina McGuigan, the sister of Hannah, testified that, excepting during a few months after Hannah's marriage, her mother and she maintained most cordial relations with Hannah up to the time of her death; that during the last three months of Hannah's life, Hannah stayed with her mother about two months at night, returning to her home in the day to attend to business, and that her mother had given this business to Hannah. Christina testified that five years before Hannah's death the witness found her lying in the vestibule of her mother's house, panting and sobbing, and that afterward, when the witness asked Frank about it, he had replied, "I do not know what I do; some of these times I will do something that I cannot undo." Upon objection to this declaration, the court excluded it, and the caveators excepted. When, the year before the death of the testatrix, this witness noticed much tinware on the table, and a tomato can with coffee in it, the witness said, "Those things will poison you," and Hannah had replied she could not help it; that Frank had smashed her last coffee can over her head, and she was afraid to buy another for fear it would go the same way and he would kill her; that he had smashed all the dishes, and she could only use tin. In the spring before her sister's death, the witness testified that on one occasion she had

found her sister had been locked in the house. Frank had told her that he wanted his wife to make a will giving him all, and exclude her mother; that he frequently threatened his wife, and Hannah was afraid of him.

The court refused to permit this witness to prove statements of the deceased respecting the disposition of her property, and what she intended to do for the witness, and how much she feared her husband; and to these rulings the caveators excepted; and the witness was not permitted to show that Hannah took measures to secure a divorce, and desisted because of her fear of her husband; and to this ruling of the court the caveators also excepted.

Upon cross-examination this witness testified that Hannah said to her, "Stina, I cannot do as I said, for he says if I leave him he will kill me and kill mamma."

Upon objection, the court would not permit Samuel R. Turner to testify that at Mrs. Kultz's house, in 1901, he had seen Hannah in tears and appearing to be intimidated by Frank, the court holding that this incident was too remote.

Four other witnesses testified to quarrels between Frank and Hannah Jaeger. Mary Jaeger, the wife of Carl, testified that on the evening of the day the will was made Frank told her husband that he was all right now; that Hannah was fixed all right. She had made a will, and he was safe, and she could go to the hospital. The witness also testified to several quarrels and repeated instances of ill treatment of Hannah by Frank.

Christina Kultz testified to the pleasant relations between her daughter Hannah and herself, and that frequently Hannah stayed all night at her mother's house, and that she would go to her store during the day, and in the evening after business hours come back to her mother's home; and that when Hannah was sick, on the day before the will was made, the witness had sent for the doctor; that the witness kept store for Frank while he went to get Boyer, and on Friday the witness took Hannah to the hospital; but the witness was not permitted to testify what her daughter had told her concerning the will, at the hospital, on Saturday following its execution on Wednesday.

She also told of an early difference between herself on one side, and her daughter and her husband on the other, concerning rent due from them to her, and of a dispute over a piano, and of many times when Frank abused Hannah, who would come to the witness for protection, although she said that, for some months prior to the death of Hannah, Frank and the witness were on good terms. The defendants here closed their case, and the court thereupon directed the jury to return a verdict in favor of the caveatee upon all three issues, to which ruling the caveators excepted, and the jury returned their verdict in accordance with the court's instruction.

*Mr. H. B. Moulton* and *Mr. John Ridout* for the appellants.

*Mr. Wilton J. Lambert* for the appellee.

Mr. Justice McComas delivered the opinion of the Court:

There was no evidence which would have justified the jury in returning a negative answer to the first issue; indeed, there was no evidence that Hannah Jaeger lacked testamentary capacity. The evidence was all the other way, and the declarations of the testatrix were excluded by the court because they were offered upon the issue relating to undue influence only.

The second issue was properly answered in the affirmative. That Hannah Jaeger executed this will was undisputed.

We have substantially stated the testimony which relates to the third issue,—the inquiry whether or not the will was procured by the undue influence of Frank Jaeger. When a wife, as in this instance, makes a will devising all of her estate to her husband, there is no inference of undue influence merely from that fact. These parties had lived together as husband and wife for about ten years, and the testimony shows that often during that period they quarreled, and that the husband had been abusive and threatening toward his wife; but it appears that they lived together, and did not separate. The court below remarked that the witnesses to the will bore strong testimony as to

the capacity of the testatrix and to her knowledge of what she was doing. There is nothing in the record to indicate that the testatrix was incapable of making a will, and there is an absence of any testimony to show that Frank was present at the making of the will. His quarreling and threats of personal injury would tend to dissuade a wife of good sense, a business woman as the testatrix was, from giving her property to her husband. But the testimony does not indicate that she was unforgiving. Years before she had conveyed half of her property to him, and there is some evidence that the former conveyance resulted from his importunity. Apart from the quarrels and disagreements during the last years of her life, there is no evidence that the husband was urging the wife to make the will, or that she yielded to any such importunity. It does appear that Frank told his brother Carl he was anxious she should make such will, and that he went after Boyer, the notary public, who prepared the will, and, with another, witnessed it. It appears that he was anxious for such a will as the testatrix made.

The age of the testatrix does not appear. The evidence indicates that she was in the prime of life; that she had considerable business capacity, and had attended to business until the day when she executed the will; and the evidence shows that she had been and was then of sound and disposing mind and capable of executing this will; and the Supreme Court has announced the rule that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. *Beyer* v. *Le Fevre,* 186 U. S. 126, 46 L. ed. 1085, 22 Sup. Ct. Rep. 765. There is no presumption of law that a devise to the husband by his wife is fraudulent. That a wife should devise her property, or some of it, to her husband, is not unnatural, nor is it suggestive of undue influence. *Montgomery* v. *Craig,* 128 Ind. 48, 27 N. E. 427; *Orth* v. *Orth,* 145 Ind. 184, 32 L.R.A. 309, 57 Am. St. Rep. 185, 42 N. E. 277, 44 N. E. 17.

Her personal estate was principally $4,000 or $5,000 in money in a building association. Her real estate was an undivided half of two houses and lots worth about $5,000, and an

undivided half interest in another house of small value. Her husband owned the other undivided half of the two houses and lots first mentioned. The evidence admitted in this case is that there were repeated quarrels and disputes between the pair during a series of years, and of ill treatment of the wife by the husband. It appears that Frank went for Boyer, the real estate man, who prepared the will, and soon thereafter, on the same day, Frank said to his brother, a witness for the caveators, "I am all right now; I have got it fixed up now." There is other evidence that Frank wanted Hannah to make a will, that he was selfish and unfeeling, and anxious that she should make a will before she went to the hospital. Mary, the wife of Carl Jaeger. says she heard Frank tell Carl that he was all right now, and Hannah was fixed all right; she had made a will and could go to the hospital. The will was not an unnatural will, and that a wife should have a quarrelsome husband, and on the eve of her death be ready to forgive and forget, is not uncommon. This couple were childless; her mother and sister, the caveators, were in no wise dependent upon the testatrix. At most, we cannot say that this evidence amounted to more than a suspicion of undue influence,—a possibility of threats approaching duress. The court below heard all of the witnesses, saw them all, and determined to instruct the jury to find for the caveatee upon all these issues; that his instruction in respect to two of these issues was right is not disputed.

Under all the circumstances, we cannot reverse his conclusion in respect of the third issue of undue influence. The declarations of the testatrix, made before and after the execution of this paper, were excluded because they could only relate to this last issue. It is assigned as error that the court erred in excluding all the testimony concerning the relations between Hannah and Frank Jaeger prior to the execution of this paper. The evidence we have recited shows that the court very liberally admitted evidence of frequent quarrels and disputes between them. There is no reversible error here.

It is claimed that the court erred in excluding the declarations of his wife concerning her relations with her husband before and

after the execution of this paper, and also in excluding her declarations as to her testamentary intentions. We have already stated the instances in which the court excluded such declarations. In our opinion the court carefully followed the rule in *Throckmorton* v. *Holt,* 180 U. S. 552, 45 L. ed. 663, 21 Sup. Ct. Rep. 474. In that case the issues were forgery and revocation. In this the issues were the execution of the will, mental capacity, and undue influence; but the execution of the will was undisputed, and the mental capacity of the testatrix was clearly shown by the caveator's testimony. The disputed issue was that concerning undue influence. The court correctly applied the rule so clearly stated by Mr. Justice Peckham: "After much reflection upon the subject, we are inclined to the opinion that not only is the weight of authority with the cases which exclude the evidence both before and after the execution, but the principles upon which our law of evidence is founded necessitate that exclusion. The declarations are purely hearsay, being merely unsworn declarations, and, when no part of the *res gestæ,* are not within any of the recognized exceptions admitting evidence of that kind. Although in some of the cases the remark is made that declarations are admissible which tend to show the state of the affections of the deceased as a mental condition, yet they are generally stated in cases where the mental capacity of the deceased is the subject of the inquiry, and in those cases his declarations on that subject are just as likely to aid in answering the question as to mental capacity as those upon any other subject. But if the matter in issue be not the mental capacity of the deceased, then such unsworn declarations as indicative of the state of his affections are no more admissible than would be his unsworn declarations as to any other fact.

"When they are not a part of the *res gestæ,* declarations of this nature are excluded because they are unsworn, being hearsay only; and where they are claimed to be admissible on the ground that they are said to indicate the condition of mind of the deceased with regard to his affections, they are still unsworn declarations, and they cannot be admitted if other unsworn declarations are excluded. In other words, there is no ground for

an exception in favor of the admissibility of declarations of a deceased person as to the state of his affections, when the mental or testamentary capacity of the deceased is not in issue." Pp. 573, 574, L. ed. pp. 673, 674, Sup. Ct. Rep. pp. 482, 483.

We therefore hold that the court below committed no error in excluding proof of the declarations of Hannah Jaeger, before and after the execution of this paper, concerning her testamentary intentions, or concerning her relations with her husband, her mother, and her sister prior to its execution.

The fourth assignment of error insists the court erred in excluding testimony tending to show that the testatrix was ignorant of the fact that she had executed the alleged will. From the record we cannot find that such testimony was offered.

The court did not err in excluding from the jury the statement of Christina McGuigan that about 1898 she found her sister Hannah lying panting in the vestibule of Christina's house, and that thereafter Frank Jaeger made the remarks which we have before mentioned; nor did the court err in excluding the testimony of Mrs. Carl Jaeger that, eight years before her death, Hannah Jaeger ran into her house, saying that Frank Jaeger had threatened to kill her. This evidence of quarrels between the husband and wife occurring five years and eight years before the death of Hannah Jaeger was followed by long intervals wherein this couple lived together amicably. They never separated, and during the last few months of Hannah Jaeger's life they dwelt together in comparative quiet and peace.

The court properly rejected the testimony of the witness Turner that three and a half years before the death of Hannah Jaeger, when he was making repairs upon the house of Mrs. Kultz, he saw Mrs. Jaeger in tears, and in his opinion her manner toward Frank Jaeger was that of a woman who was cowed and intimidated, and she was very humble before her husband. Such an opinion was not admissible.

We have thus disposed of all the exceptions to testimony we need consider.

Appellants' counsel insist that the alleged will should be held to be an incomplete testamentary paper because as it is written

it is meaningless, and because the names of the residuary dev-
isees and legatees were never inserted in the blank spaces in-
tended for such names; that on its face it shows that this was
never a final and complete testamentary paper. A paper may
not operate as a will disposing of property, and yet it may be
good as a testamentary appointment of an executor, and there-
fore be admitted to probate if, looking at the entire paper, it
is clear the paper was executed *animo testandi. Lungren* v.
*Swartzwelder,* 44 Md. 491.

This paper not only appoints an executor, but intends to de-
vise and bequeath real and personal property, in language which
we do not here need to interpret, and also contains a residuary
clause with two blanks for names, the effect of which we need not
here consider. It suffices upon these issues to say that the whole
paper, taken together, shows on its face that it was executed
*animo testandi;* that the person who executed it did so intend-
ing to dispose of all her estate and to name her executor; and it
was witnessed properly as a will conveying real estate. The
contents and execution of the paper conclusively prove it to be
in that sense a complete paper,—a testamentary disposition of
property which should be admitted to probate. Whether the de-
vises and bequests, or any of them, be invalid or in part inef-
fective, we may not upon these issues inquire. The formal pa-
per contains the blanks where the names of the residuary bene-
ficiaries should appear, but the omissions do not determine that
the testatrix did not intend the paper, as it stood, to be her will.
On the contrary, it is a complete and finished paper, executed
and published *animo testandi,* without anything further to be
done in order to perfect it. These omissions alone do not make
it an invalid will.

The judgment of the Court below must be *affirmed, with
costs, and it is so ordered.*

The appellants applied for a writ of error to the Supreme
Court of the United States, on May 15, 1907, and the same was
allowed on the same day.